**FEE PAID**

FILED

1    Louis J. Cohen
     LOUIS J. COHEN, A PROF. CORP.
2    28720 Roadside Drive, Suite 273
     Agoura Hills, CA 91301

2023 SEP -1  PM 3: 5'

3    Tel: (818) 889-5777
     Fax: (818) 991-6999
4    Email: louis@louiscohenlaw.com
     Cal. State Bar No. 123968

**rsm**

5

6    Charles H. Rabon, Jr.
     RABON LAW FIRM, PLLC
7    413 S. Sharon Amity Road, Suite C
     Charlotte, NC 28211
8    Tel.: (704) 247-3247
     Fax: (704) 208-4645
9    Email: crabon@usfraudattorneys.com
     *Pro Hac Vice Application to be Filed*

10   Attorneys for Plaintiff-Relator

11             UNITED STATES DISTRICT COURT

12           CENTRAL DISTRICT OF CALIFORNIA

13                WESTERN DIVISION

| | |
|---|---|
| 14 | |
| 15   UNITED STATES OF AMERICA and THE STATE OF CALIFORNIA *ex rel.* EDWIN GVALEVECH, | Case No. **2:23-CV-07277-AB-JCx** |
| 16 | **FALSE CLAIMS ACT COMPLAINT** |
| 17          Plaintiffs, | |
| | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)** |
| 18      v. | |
| 19   KROGER SPECIALTY PHARMACY HOLDINGS 2, INC., KROGER SPECIALTY PHARMACY | **JURY TRIAL REQUESTED** |
| 20   HOLDINGS 1, INC., KROGER SPECIALTY PHARMACY | |
| 21   HOLDINGS, INC., THE KROGER COMPANY, ERL MEDICAL | |
| 22   CORPORATION, BRENDA GOODMAN, THOMAS C. DERVIN, | |
| 23   EMMANUEL R. LIM MD, | |
| 24 | |
| 25         Defendants. | |

26                   <u>Introduction</u>

27      1.    For over two decades, Defendants paid kickbacks to high-value

28   prescribers of lucrative AIDS and HIV drugs in the form of co-pay waivers and

FALSE CLAIMS ACT COMPLAINT - 1

1    account balance (account receivable, or A/R) write-offs in favor of the physicians,

2    their spouses/significant others, and employees. These physicians were identified in

3    company reports as "referral sources." The co-pay waivers and write-offs were a

4    transparent attempt to induce and reward referrals.

5        2.    This is the very rare case where evidence of intent to induce referrals is

6    well-documented. When David Cokely, a provider employed by high-value

7    prescriber Dr. Honzel, came to pick up his medication, incredibly, he told the

8    pharmacist-in-charge ("PIC") ***because he works at Dr. Honzel's office*** he doesn't

9    want to pay copays." The PIC informed Defendant Goodman, the architect of the

10    kickback scheme, of Cokely's demand and asked: "What would you like to do?"

11    Goodman's instructions were clear—make Cokely's account "E-WO" (exception

12    write-off): *"Please make him E-WO…maybe we can get more biz form (sic) him."*

13        3.    The email of December 17, 2012, attached as Exhibit 1, provides:

14    
| From: | Brenda Goodman |
|---|---|
| Sent: | Monday, December 17, 2012 8:48 PM |
| To: | Ramona Edery |
| Cc: | Milton Nassar |
| Subject: | RE: DAVID COKELY |
| | |
| Follow Up Flag: | Flag for follow up |
| Flag Status: | Completed |

Please make him E-WO….maybe we can get more biz form him.
B

Brenda Goodman
Senior Vice President, Specialty Pharmacy
110 East Huntington Drive
Monrovia, CA 91016
Tel: 626-932-1608
Cell: 323-868-7550
bgoodman@modernhealthinc.com

-----Original Message-----
From: Ramona Edery
Sent: Monday, December 17, 2012 11:18 AM
To: Brenda Goodman
Cc: Milton Nassar
Subject: DAVID COKELY

He told Milton because he works at Dr. Honzel's office he doesn't want to pay copays. ▮▮▮▮▮▮▮

What would you like to do? If we don't charge him his copays we lose $10 on 36034277, $4 on 34006428, $2 on 36035972, and $17 on 34006427

Ramona Edery
Pharmacist in Charge/Pharmacy Manager
ADRX Pharmacy

FALSE CLAIMS ACT COMPLAINT - 2

1      4.     Senior leadership, including Defendant Thomas C. Dervin ("Dervin"),

2 the Chief Operating Officer ("COO") of the Kroger Specialty Pharmacy enterprise

3 ("KSP") (but who, for W-2 purposes received his paycheck from Kroger Specialty

4 Pharmacy Holdings 2, Inc.) and its predecessor ModernHealth, knew *at least* since

5 2015, that ModernHealth and KSP were, for years, routinely waiving large co-pays

6 and writing off account balances owed by referring physicians, significant others or

7 spouses, and employees.

8      5.     In an email dated February 18, 2015 to members of senior leadership

9 including Dervin, Defendant Brenda Goodman ("Goodman") sent spreadsheets for

10 the years 2013 and 2015 reflecting co-pay waivers and write-offs for "doctors,

11 doctors and HIV clients, those who work in doctor's office and significant others."

12      6.     The email of February 18, 2015 and referenced spreadsheets, attached

13 as Exhibit 2, plainly and openly reveal these kickbacks and in fact highlight the

14 names of those persons who received them:

15 **From:**              Brenda Goodman
   **Sent:**              Wednesday, February 18, 2015 6:00 PM
16 **To:**                Jeffrey Shore; Rosemary McDermott; Tom Dervin
   **Cc:**                Ramona Edery
17 **Subject:**           FW: ADRX Monthly Adjustments for May 2013
   **Attachments:**       ADRX Adjustments for 2013.xls; 2015 Month End Patient Adjustments.xls

18 **Follow Up Flag:**    Flag for follow up
   **Flag Status:**       Completed
19

20 Morning
   Attached please see the ADRX adjustments that Barbara used to send out to us before she left.
21 I took Mario's report and cross referenced it, highlighted in yellow those that are legacy, also added those that are
   doctors, doctors and HIV clients, work in doctor's offices and
22 Significant others
   The rest should be sent FAA forms if they are not ADAP or MEDICAL
23 Please let me know if you have any questions
   Thanks
24 Brenda

25
26 Brenda Goodman
   Senior Vice President, Specialty Pharmacy
27 7373 Lincoln Way
   Garden Grove, CA, 92841
   Tel.626-932-1608
28 Cell 323-868-7550
   Brenda.goodman@modernhealthinc.com

FALSE CLAIMS ACT COMPLAINT - 3

7.      The email concluded by noting that the "rest should be sent FAA forms if they are not ADAP or MEDICAL." This reflects that the doctors, employees, and family members did not have any financial need or hardship, since the FAA (Financial Assistance Application) forms were completed by patients requesting co-pay waivers based on financial hardship, and that the "rest" were not individuals capable of making referrals to the pharmacy.

## Statement of the Case

8.      This is an action to recover millions of dollars in damages and civil penalties on behalf of the United States for Defendants' violations of the federal False Claims Act ("FCA"), and for the State of California for violations of the California False Claims Act ("CFCA"), as a result of illegal kickbacks given to, and for the benefit of, certain "high-value" physicians who prescribed expensive AIDS and HIV drugs (but also including other drugs) that were then filled at two pharmacies in Los Angeles that were owned, managed, and controlled by the Kroger Defendant legal entities.[1]

9.      The Defendants' conduct was in clear and direct violation of the Anti-Kickback Statute ("AKS") and the Stark Law ("Stark"), and no "safe harbor" or exception applied to that conduct.  The kickbacks primarily were in the form of co-pay waivers and account balance (account receivable, or A/R) write-offs in favor of the physicians, their spouses/significant others, and employees.

10.     Over a period of years, the kickbacks amounted to not less than $125,000.  In return, the high-value prescribing physicians wrote prescriptions that were filled at those pharmacies, and which were reimbursed by federal and state Government payors to the tune of over $82 million between 2011 and 2020, which

---

[1] As discussed elsewhere in this complaint, the vast majority of the kickback-tainted claims relate to prescriptions filled at Ad-Rx, the Kroger specialty pharmacy located on Wilshire Boulevard in Los Angeles, California. Other tainted prescriptions were filled at Kroger's sibling pharmacies, PX, located in Garden Grove, and Biofusion, located in Torrance.

FALSE CLAIMS ACT COMPLAINT - 4

was just a part of the period during which this scheme operated.

11.    The Defendants in this case are (a) legal entities that are part of the Kroger Company and include (i) Kroger Specialty Pharmacy Holdings 1, Inc., (ii) Kroger Specialty Pharmacy Holdings 2, Inc., (iii) Kroger Specialty Pharmacy Holdings, Inc., and (iv) The Kroger Company; and (b) individual defendants (i) Senior Vice President ("SVP") of HIV/TP Business Development & Sales Brenda Goodman – the "principal architect" and implementer of the fraud scheme, (ii) COO Thomas C. Dervin – Goodman's boss who knew about, sanctioned, and approved the fraud scheme, and (iii) Dr. Emmanuel R. Lim, who was the most prolific among all the prescribers who received kickbacks and who, personally, received the greatest amount of kickbacks.

12.    Each of the defendants either directly caused claims tainted by kickbacks to be submitted for reimbursement by federal health care programs, caused tainted claims to be submitted based on false claims or by using false records and statements, or conspired to do so.  The corporate defendants also, in particular, acknowledged, approved, and sanctioned the kickbacks.  The conduct of all defendants to the scheme was "knowing" within the meaning of the FCA.

13.    The actual pharmacy at which the vast majority of the fraud scheme was perpetrated was known as Ad-Rx Pharmacy (and then later "Kroger Specialty Pharmacy"), and was located at 6240 Wilshire Boulevard, Los Angeles, California. Until mid-2016, that pharmacy was part of a business conglomerate known as Modern HC Holdings, Inc.  The Kroger Company acquired that entity through a subsidiary called Axium Pharmacy Holdings, Inc., via a Stock Purchase that occurred on or about July 19, 2016.  After that stock sale, Kroger rebranded the Modern HC Holdings pharmacies, together with other Axium pharmacies, as "Kroger Specialty Pharmacy," and operated all locations nationwide as "a combined specialty pharmacy."

14. Brenda Goodman, in her capacity as SVP, Specialty Pharmacy and Operations for Ad-Rx, and later SVP, HIV/TP Business Development & Sales after the Kroger transaction, was the principal architect of the kickback scheme. During the time the kickback scheme operated, and through her retirement in 2019, Goodman received large bonuses for sales of the expensive drugs sold through the specialty pharmacy. Just between 2015 and 2019 alone, Goodman received nearly $400,000 in bonuses – over and above her salary. Goodman approved co-pay waivers and A/R write offs for high value prescribers for many years. On an occasion in 2012, when questioned by another pharmacist, Goodman nonetheless approved kickbacks to a prescriber's employee – overtly stating in an email that doing so could generate more referral business. Despite her having created a lucrative – and obvious – kickback scheme that greatly benefited both her employer and herself, Goodman stated under oath in 2023 that her decision to give these co-pay waivers and A/R write-offs to high-value prescribers was merely a "silent gesture of friendship." There is no AKS safe harbor that permits friendship kickbacks that result in referrals for goods that are paid for by federal or state health care programs.

15. In 2018, Goodman was instructed by upper management of Kroger Specialty Pharmacy to go and collect unpaid account receivables from at least some of the physicians to whom Goodman had engineered kickbacks in return for referrals. Goodman did not do that.

16. In 2015, Goodman provenly informed senior management of Modern HC Holdings, including COO Dervin, of the kickback scheme, by sending him an email and spreadsheets showing write-offs given to high-value prescribers, their spouses/significant others, and employees. The spreadsheets included numerous examples of notations explaining the write-offs for the high-value prescribers using the term "CRTSY ADJ BG," which meant *"Courtesy Adjustment Brenda Goodman."* Before the 2016 transaction between Modern HC Holdings and Axium,

Dervin was COO of all specialty pharmacies operated by Modern; after the Kroger stock purchase and establishment of "Kroger Specialty Pharmacy" nationwide, Dervin continued to be COO of the combined entity, and all pharmacy locations reported to and through him. Dervin undeniably knew about the kickback scheme and approved of it.

17.    All totaled, there were at least twelve (12) individuals who received kickbacks in the form of co-pay waivers and A/R write-offs. Among these were at least seven (7) prescribing physicians. With regard to the kickback scheme, Goodman and Dervin (at the least) approved having the pharmacies' point-of-sale software modified (by the inclusion of certain codes) to notate that the kickback recipients were not to be charged co-pays. The kickback recipients received monthly statements showing either that they did not owe co-pays or did not have account balances, or, when those statements did show balances owed, it was understood that the recipients were not expected to pay the amounts owed and that Ad-Rx (and later Kroger Specialty Pharmacy) would take no steps against them to collect the obligations. None of the kickback recipients sought, nor would they have qualified for, hardship waivers.

18.    A previous FCA lawsuit was brought by Relator against Kroger Specialty Pharmacy, Inc., Kroger Specialty Pharmacy CA2, LLC, and Dr. Lim, captioned *United States of America, and the State of California, ex rel. Edwin Gvalevech v. Kroger Specialty Pharmacy, Inc., Kroger Specialty Pharmacy CA2, LLC, ERL Medical Corporation, Emmanuel R. Lim, MD*, Case No. 17-cv-2141 (C.D. Cal.). The defendant Kroger Specialty Pharmacy CA2, LLC was the single-location entity created for the operation of the pharmacy located at 6240 Wilshire Boulevard, Los Angeles. Kroger Specialty Pharmacy, Inc. is an entity owned and operated by Kroger, located in Lake Mary, Florida, and which was reasonably believed and understood to be the upstream parent of Kroger Specialty Pharmacy CA2, LLC at the time of filing. During the under-seal investigation phase of that

1  action, the Kroger entities learned of the existence of the FCA case and responded to
2  that information by shuttering operation of the 6240 Wilshire Boulevard location of
3  Kroger Specialty Pharmacy.  Then, not coincidentally and within days after the
4  government declination decision, Kroger Specialty Pharmacy CA2, LLC was
5  terminated in Delaware (state of its formation) and its authority in California was
6  cancelled.  After declination, all entities were served, and both Kroger Specialty
7  Pharmacy CA2, LLC and Kroger Specialty Pharmacy, Inc. appeared and defended
8  the action for more than a year.  However, the Kroger defendants did not disclose to
9  the court or Relator that Kroger Specialty Pharmacy CA2, LLC had terminated its
10 existence until July 19, 2022 when the Kroger defendants produced a Certificate of
11 Cancellation, signed August 30, 2021, *five days after the action was unsealed*.

12     19.    The Kroger defendants did not disclose the termination of Kroger
13 Specialty Pharmacy CA2, LLC until months after the deadline for hearing a motion
14 to amend the complaint to add parties had passed.  Further, in that prior action, the
15 Kroger defendants stonewalled Relator's ability to do any meaningful discovery
16 with regard to Kroger Specialty Pharmacy, Inc.'s actual role.

17     20.    On March 24, 2023, the court granted a motion for summary judgment
18 in favor of Kroger Specialty Pharmacy CA2, LLC and Kroger Specialty Pharmacy,
19 Inc.  As to Kroger Specialty Pharmacy CA2, LLC, the court granted judgment on
20 the basis that "KSP CA2 is defunct and lacks the capacity to be sued."  As to Kroger
21 Specialty Pharmacy, Inc. the court granted judgment on the ground that "there is no
22 evidence that KSP had any involvement in the pharmacy at issue."  Relator had not
23 proven that either Goodman or Dervin worked for that entity or raised an issue of
24 material fact as to the liability of Kroger Specialty Pharmacy, Inc.  In depositions,
25 Defendants' witnesses Goodman and Dervin claimed instead that they worked for
26 Kroger Specialty Pharmacy CA2, LLC and Kroger Specialty Pharmacy Holdings 2,
27 Inc. (an apparent holding company), respectively, and not Kroger Specialty
28 Pharmacy, Inc. (an apparent operating company).

1    21.    The court never ruled on the merits that either the fraud scheme to pay

2    kickbacks did not exist, or that such conduct violated AKS, and hence, the FCA.

3    The court also did not rule on the allegations that the Government payors had been

4    massively damaged when they unknowingly paid out tens of millions of dollars in

5    kickback-tainted claims. The court denied the summary judgment motion as to the

6    Lim defendants, but they were later dismissed without prejudice.

7    22.    The present case is not barred by the court's non-merits rulings in

8    Case. No. 17-cv-2141.  The current Kroger defendants here (Kroger Specialty

9    Pharmacy Holdings 1, Inc., Kroger Specialty Pharmacy Holdings 2, Inc., Kroger

10   Specialty Pharmacy Holdings, Inc., and The Kroger Company) were not Defendants

11   in the prior action and are all proper Defendants since they caused to be presented,

12   false or fraudulent claims for payment, made, used, or caused to be made or used,

13   false records or statements material to false or fraudulent claims, and engaged in a

14   conspiracy.  Some of those defendants are also culpable under the legal theory of

15   alter ego.

16   23.    Defendant Dervin, who claimed to have been employed by Kroger

17   Specialty Pharmacy Holdings 2, Inc., exercised management responsibility over

18   more than a dozen Kroger entities. Defendant Goodman, who claimed to have been

19   employed by Kroger Specialty Pharmacy CA2, LLC exercised management and

20   sales responsibilities over multiple California pharmacy locations.

21   24.    "Kroger Specialty Pharmacy" was in fact managed and operated as a

22   unified, nationwide entity that both preached fraud, waste, and abuse compliance

23   and, at the same time, knowingly allowed its agents, servants and employees to

24   commit fraud through giving kickbacks.

25   25.    Defendant Lim also caused to be presented, false or fraudulent claims

26   for payment, and made, used, or caused to be made or used, false records or

27   statements material to false or fraudulent claims, and likewise engaged in conspiracy

28   to commit violations of the False Claims Act.

FALSE CLAIMS ACT COMPLAINT - 9

1    26.    The harm and damages to the United States, and the State of California,

2    caused by Defendants' conduct was substantial.

3    **Jurisdiction and Venue**

4    27.    This action arises under the FCA, as amended, 31 U.S.C. §§ 3729-33

5    and the CFCA, Cal. Gov. Code §§ 12650-56. This Court has jurisdiction over this

6    action under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1331 and 1345.

7    28.    Venue is proper in the Central District of California pursuant to 28

8    U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

9    29.    This Court may exercise personal jurisdiction over Defendants pursuant

10    to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because each of them transacts

11    business in this District.

12    **The Parties**

13    **A. Kroger Defendants**

14    30.    Defendant Kroger Specialty Pharmacy Holdings 2, Inc. ("KSP

15    Holdings 2") is a Delaware corporation having its principal place of business at

16    3200 Lake Emma Road, Suite # 1000, Lake Mary, Florida 32746. KSP Holdings 2

17    is registered to do business in California and in Florida. KSP Holdings 2's

18    Registered Agent is Corporation Service Company and may be served with legal

19    process at 251 Little Falls Drive, Wilmington, Delaware, 19808.

20    31.    Defendant Kroger Specialty Pharmacy Holdings 1, Inc. ("KSP

21    Holdings 1") is a Delaware corporation with its principal place of business located

22    at 1014 Vine Street, Cincinnati, Ohio 45202. KSP Holdings 1's Registered Agent is

23    Corporation Service Company and may be served with legal process at 251 Little

24    Falls Drive, Wilmington, Delaware, 19808.

25    32.    Defendant Kroger Specialty Pharmacy Holdings, Inc. ("KSP

26    Holdings") is a Delaware corporation with its principal place of business located at

27    1014 Vine Street, Cincinnati, Ohio 45202. KSP Holdings' Registered Agent is

28

1  Corporation Service Company and may be served with legal process at 251 Little
2  Falls Drive, Wilmington, Delaware, 19808.

3    33. Defendant The Kroger Company ("Kroger") is an Ohio corporation
4  with its principal place of business at 1014 Vine Street, Cincinnati, Ohio 45202. It is
5  the parent of the other Kroger Defendants and the owner and operator of all Kroger
6  specialty pharmacies, including those at issue in this case. Thus, in its 2021 Form
7  10-K SEC Report, Kroger refers to "our Kroger Specialty Pharmacy reporting unit"
8  or "KSP reporting unit."[2]  Likewise, Kroger reports sales revenue of the KSP
9  reporting unit only as consolidated with other of its business' units.[3]  The Kroger
10 Company's Registered Agent is Corporation Service Company and may be served
11 with legal process at 3366 Riverside Drive, Suite 103, Upper Arlington, Ohio,
12 43221.

13   34. Policies and procedures regarding the operation of Kroger specialty
14 pharmacies, including those implicating the conduct at issue in this matter, such as
15 the Pharmacy Code of Conduct, are disseminated and controlled by Kroger and its
16 Chief Ethics & Compliance Officer. The "SOP Policy On Interactions With Referral
17 Sources" are disseminated by, through, and in the name of an entity known as
18 "Kroger Specialty Pharmacy." In said policy, the term "'Company' means,
19 collectively, Kroger Specialty Pharmacy Holdings, Inc., Kroger Specialty
20 Pharmacy, Inc., Kroger Specialty Pharmacy Holdings 2, Inc., Kroger Specialty
21 Pharmacy Holdings 3, Inc., Kroger Specialty Infusion Holdings, Inc. and all their
22 affiliated pharmacies as well as all other subsidiaries as may be acquired from time
23 to time."

24

25

---

26 [2] Kroger 2021 10-K at 37, 53, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-
27 0000056873/657ebbe2-fe23-4e82-9475-5aee0116fdfd.html (last visited Dec. 6, 2021).
[3] *Id.* at 66.

28

FALSE CLAIMS ACT COMPLAINT - 11

1    35.    "[W]here an entity uses its ability to control or influence another to

2    submit false claims, that entity is not shielded from liability based on its mere status

3    as a separate entity." *U.S. ex rel. Ebu-Isaac v. INSYS Therapeutics, Inc.*, 2021 WL

4    3619958, at *5 (C.D. Cal. June 9, 2021)

5    **B. ERL Medical Corporation**

6    36.    Defendant ERL Medical Corporation, d/b/a LimKeith Multispecialty

7    Medical Clinic, Inc., ("ERL" or "LimKeith,") is a California closely held

8    corporation with its principal place of business at 2428 Glendower Ave, Los

9    Angeles, California 90029. At all relevant times, ERL was a general medical

10    practice located at 6200 Wilshire Blvd #1510, Los Angeles, CA 90048 with a

11    special focus on the treatment of HIV/AIDS and providing pain management

12    services as well as urology, psychiatric, psychological, chiropractic, urgent care,

13    minor surgery, and infusion therapy services. ERL's president and registered agent

14    is Emmanuel R. Lim at 2428 Glendower Avenue, Los Angeles California 90027.

15    **C. Individual Defendants**

16    37.    Defendant Brenda Goodman ("Goodman") is a resident of the State of

17    California and may be served with legal process at her residence located at 637 N.

18    Curson Avenue, Los Angeles, California 90036.  At all times relevant herein,

19    Goodman was a registered pharmacist in the State of California with pharmacy

20    license #42552.  Goodman emigrated from her native South Africa to the United

21    States in or around 1988 and spent her entire professional career with Kroger

22    Specialty Pharmacy and its predecessor entities owned and operated by

23    ModernHEALTH in Los Angeles.  As discussed below, Goodman retired in 2019.

24    38.    Defendant Thomas C. Dervin ("Dervin") is a resident of the State of

25    Nebraska and may be served with legal process at his residence located at 12923

26    Seward Street in Omaha, Nebraska 68154.  At all times relevant herein, Dervin

27    was Chief Operating Officer ("COO") of Kroger Specialty Pharmacy and its

28    predecessor entities owned and operated by ModernHEALTH, including the

1  entities located in Los Angeles.  As discussed below, Dervin took medical leave in
2  or around 2017 and then later did not return to employment with any Kroger
3  Specialty Pharmacy or Kroger entity.

4        39.    Defendant Emmanuel R. Lim, MD is believed to be residing in the
5  Philippines and may be served with legal process at his residence located at 80 R.
6  Magsaysay Boulevard in Quezon City, Philippines.  Defendant Lim is the founder,
7  majority owner, and Medical Director of ERL Medical Corporation.  He is a
8  licensed physician in the State of California with NPI # 1275514234.  During all
9  times relevant herein, Lim was a resident of Los Angeles, California.

10 **<u>Regulatory Background</u>**

11 **A. The False Claims Act**

12       40.    The False Claims Act provides, in pertinent part, that any person who:

13 (A) knowingly presents, or causes to be presented, a false or fraudulent
   claim for payment or approval; [or]
14
15 (B) knowingly makes, uses, or causes to be made or used, a false record
   or statement material to a false or fraudulent claim; [or]

16 (C) conspires to commit a violation of subparagraph (A), (B), (D), (E),
17 (F), or (G); [or]

18 (G) <u>knowingly</u> makes, uses, or causes to be made or used, a false
   record or statement <u>material</u> to an <u>obligation</u> to pay or transmit money
19 or property to the Government, or <u>knowingly</u> conceals
   or <u>knowingly</u> and improperly avoids or decreases an <u>obligation</u> to pay
20 or transmit money or property to the Government,

21 is liable to the United States Government for a civil penalty of not less than
   $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties
22 Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–
   410 [1]), plus 3 times the amount of damages which the Government sustains
23 because of the act of that person.

24 31 U.S.C. § 3729(a)(1).

25       41.    For purposes of the False Claims Act, "the terms 'knowing' and
26 'knowingly' mean that a person, with respect to information[,] (i) has actual
27 knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity
28 of the information; or (iii) acts in reckless disregard of the truth or falsity of the

FALSE CLAIMS ACT COMPLAINT - 13

information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

### B. The Anti-Kickback Statute

42.     The anti-kickback statute ("AKS") makes it illegal to:

> knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. . . .

42 U.S.C. § 1320a-7b(b)(2).

43.     "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

44.     The Department of Health and Human Services Office of Inspector General ("OIG") has been clear since the early 1990s that the routine waiver of co-payments and deductibles is illegal under the AKS. In 1994 the OIG published a Special Fraud Alert on routine waiver of Medicare Part B co-payments and deductibles. Dept. of Health and Human Services, Office of Inspector General, Special Fraud Alert, Dec. 19, 1994. The OIG issues special fraud alerts "to identify fraudulent and abusive practices within the health care industry." This alert applied to health care providers who charge a fee-for-service to Medicare or Medicaid (like pharmacies) and covered five practices that could violate the AKS. One of those practices is the routine waiver of co-pays and deductibles. The OIG alert stated that routine waiver of deductibles and co-payments by charge-based providers, practitioners, or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and

services paid for by Medicare. The OIG made clear in 1994 the two primary reasons why routine co-pay and deductible waivers are prohibited under the AKS – they function as inducements for medically unnecessary care, and they misstate the providers actual charge, resulting in false pricing and false claims.

45.    The OIG explained its consistent and longstanding position that routine co-pay and deductible waivers constitutes health care fraud in its 2017 Advisory Opinion. HHS-OIG, Advisory Opinion No. 17-02, July 7, 2017. The OIG made clear that it is illegal under the AKS to offer or receive any remuneration to induce referrals of items or services reimbursable by a federal health care program. They reminded that the AKS is violated when even one purpose of the remuneration is to induce referrals. The OIG cited its authority under the Civil Monetary Penalties (CMPs) section of the law, and in particular the Beneficiary Inducement CMPs section of the AKS, which allows HHS to impose CMPs on an administrative basis. The OIG stated: "Our concerns regarding routine waivers of Medicare cost-sharing amounts are longstanding, and providers that routinely waive Medicare cost-sharing amounts for reasons unrelated to individualized, good faith assessments of financial hardship may be held liable under the anti- kickback statute."

46.    The federal government has consistently taken the position, since the early 1990s, that routine waiver of co-pays and deductibles corrupts the basic payment system for Medicare established by Congress, by providing inducements to providers that thwart Medicare's use of co-pays and deductibles as a health care financing component; and by creating incentives for ordering services.

47.    Defendants failed to make a reasonable or good-faith effort to collect unpaid balances from the high-value prescribers, their spouses and significant others and their employees who received co-pay waivers and write-offs.

48.    Defendants' systematic write-offs of co-payments due from its highest referring physicians do not meet the criteria of a bona-fide professional courtesy policy. First, the arrangement was not offered to all referring physicians and the

FALSE CLAIMS ACT COMPLAINT - 15

1   policy was not consistent. Second, only some of the highest referral sources for the

2   pharmacy were awarded waived co-payments.

3   **C. The Stark Law**

4   49.    42 U.S.C. §1395nn, commonly referred to as the "Stark II" statute,

5   and its associated regulations, 42 C.F.R. § 350 *et seq*., provide that, if a physician

6   has a "financial relationship" with an entity, the physician may not make a referral

7   to the entity for the provision of "designated health services," unless the relationship

8   satisfies the requirements of an exception set forth in Stark. Stark further provides

9   that an entity may not present or cause to be presented to Medicare a claim for

10  designated health services furnished pursuant to a prohibited referral. In addition,

11  Medicare is prohibited from making payment on any such claim. 42 U.S.C. §

12  1395nn(g)(1). The provisions of Stark have been extended to Medicaid pursuant to

13  42 U.S.C. §1396b(s).

14  50.    Under Stark, the definition of "designated health services" includes

15  "outpatient prescriptions drugs," including those prescribed by Defendant Lim and

16  other prescribers and dispensed to their patients by the Kroger Defendants. 42

17  C.F.R. § 411.351.

18  51.    Under Stark, a "financial relationship" consists of either an "ownership

19  or investment interest" or a "compensation arrangement." The term "compensation

20  arrangement" means any arrangement involving any remuneration between a

21  physician (or an immediate family member of such physician) and an entity subject

22  to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(A). The term "remuneration"

23  includes any payment or other benefit made directly or indirectly, overtly or

24  covertly, in cash or in kind, subject to certain exclusions. 42 U.S.C. §

25  1395nn(h)(1)(B); 42 C.F.R. § 411.351.

26  52.    Stark contains a number of exceptions, and if an arrangement strictly

27  complies with the requirements of an exception, it will be deemed not to constitute a

28  prohibited financial relationship. Although each exception has its own specific

requirements, most of the exceptions require that the arrangement between the parties be set forth in a written agreement signed by the parties, and that the compensation reflect fair market value for the services provided by the physician.

53.    The co-pay waivers provided by Defendants constitute valuable benefits to its referring prescribers, and thus constitute "remuneration" under Stark. Such remuneration reflects or takes into account the volume or value of referrals or other business expected to be generated between the parties. Thus, such remuneration creates a financial relationship with Defendants.

54.    Because a financial relationship existed between Defendants and its prescribers that received co-pay waivers, Defendants were prohibited from submitting claims to Medicare and Medicaid for designated health services unless the arrangement satisfied a statutory exception. No statutory exception applies to kickback arrangements given to these prescribers.

55.    It was not commercially reasonable for the Kroger Defendants to write off coinsurance amounts due from its key referral sources, their employees, and significant others because of the exposure to liability (both civil and potentially criminal) for violations of AKS and Stark.

56.    Accordingly, all claims for designated health services resulting from referrals from prescribers that received co-pay waivers constitute false claims.

## Factual Allegations

### A. Relator's Discovery of the Fraudulent Schemes

57.    The Plaintiff-Relator, Edwin Gvalevech, is a resident of the State of California and is a licensed pharmacist.

58.    Gvalevech was employed at the pharmacy located at 6240 Wilshire Boulevard, Los Angeles, California known as Ad-Rx (and later known as Kroger Specialty Pharmacy) from September 11, 2015 through November 17, 2017. Gvalevech was one of four staff pharmacists.

59.    Not long after he began work, Gvalevech learned that the pharmacy was dispensing copious amounts of narcotic medications based on "red flag" prescriptions.  Red flag prescriptions are those prescriptions that give rise to a pharmacist's legal duty to question whether the drugs should even be dispensed to the patient at all.  Examples include prescriptions for excessive quantities of narcotics (Schedule II), prescriptions for duplicate therapies, prescriptions that include multiple short acting narcotics, prescriptions for "Trinity Cocktails," (oxycodone, Soma, and Xanax), and the like.

60.    Gvalevech, and other pharmacists, raised issues with management about these red flag prescriptions, which he also learned seemed to be clustered among a small group of prescribing physicians.  In response, the pharmacy's management largely rebuffed Gvalevech's concerns and, over a period of months, retaliated against him.

61.    Because of the pushback on this issue by the pharmacy's management, including PIC Ramona Edery, SVP of Sales Brenda Goodman, COO Tom Dervin, Chief Administrative Office Joan Schuckenbrock, and others, Gvalevech began to look into other potentially questionable and fraudulent practices at the pharmacy.

62.    Gvalevech learned that – for years – the pharmacy had filled personal prescriptions for Dr. Emmanuel Lim and other "high value" prescribers, their spouses and employees but failed to charge or collect co-payments. Upon further investigation he learned that favors and preferential treatment were being given to those high-value prescribers in the form of (a) looking the other way and filling their "red flag" prescriptions, and (b) not charging them co-pays for their own prescriptions and writing off their account balances.

63.    Although, ultimately, Kroger Specialty Pharmacy chose to discontinue filling prescriptions written by Dr. Lim and his employee/contractor Dr. Davies, the pharmacy nevertheless retaliated against Gvalevech by putting him on a performance improvement plan.  The retaliation heaped upon Gvalevech grew and

FALSE CLAIMS ACT COMPLAINT - 18

1   was increasingly intolerable both emotionally and financially.  In November 2017,

2   Kroger Specialty Pharmacy inflicted the ultimate retaliation and fired Gvalevech,

3   asserting – pretextually – that he was being terminated due to a reduction of opening

4   hours on Saturdays and that his services were no longer needed.  Yet, just mere

5   weeks later, Kroger Specialty Pharmacy hired another pharmacist to fill his position.

6       **B. Defendants' Fraudulent Schemes**

7       64.    The pharmacy known as Ad-Rx (which ultimately became Kroger

8   Specialty Pharmacy) was founded in the 1970s.  During the 1980s, it became an

9   HIV/AIDS specialty pharmacy.  The business grew and in 2012 was acquired by

10  venture capitalists that included Altamont Capital Partners and operated under the

11  name of ModernHEALTH Specialty Pharmacy or a similarly named entity.  By

12  2016, that entity put itself up for sale and was acquired by a Kroger Company

13  owned entity (Axium Pharmacy Holdings, Inc.), and thus Kroger Specialty

14  Pharmacy was established with its national operations based out of offices in Lake

15  Mary, Florida.  A true copy of Kroger's July 20, 2016 press release announcing its

16  purchase of the outstanding shares of Modern HC Holdings, Inc. is attached hereto

17  as Exhibit 3.

18      65.    Defendant Brenda Goodman, who was the principal architect of the

19  kickback scheme, was an employee of Ad-Rx (and then later KSP CA2, LLC) for

20  most of her working career.  Goodman earned a Pharmacy degree in 1988.  She

21  worked in a series of jobs at the specialty pharmacy, first as an intern, was then

22  promoted to staff pharmacist, and later to PIC in 1993.  Goodman was then

23  promoted to Director of Pharmacy in or around 2000.  In or around 2011, Goodman

24  became the SVP, Specialty Pharmacy and Operations for Ad-Rx, a role that she

25  continued in until around September 2016 (after the Modern HC Holdings, Inc.

26  transaction with Kroger).  Goodman then moved into sales for Kroger Specialty

27  Pharmacy, becoming the SVP, HIV/TP Business Development & Sales which was

28  her final position held until she retired in 2019.

1    66.    In her later employment positions, particularly after the July 2016

2    transaction with Kroger, Goodman was listed on the website for Kroger Specialty

3    Pharmacy (www.KrogerSpecialtyPharmacy.com) as the national SVP for the entire

4    enterprise – regardless of her assertion that she was "employed by" KSP CA2,

5    LLC.[4]  By this point, Goodman's responsibilities as SVP for Kroger Specialty

6    Pharmacy extended beyond just the store located at 6240 Wilshire Boulevard, Los

7    Angeles, which was the epicenter of the kickback scheme.

8    67.    During her career, Goodman developed close relationships with the

9    physicians who (along with their spouses/significant others, and employees)

10   received kickbacks in return for referring patients and their high value HIV/AIDS

11   prescriptions to Ad-Rx, and later Kroger Specialty Pharmacy.  Goodman claimed

12   that she socialized, vacationed, and sat on charity boards with some of these

13   referring physicians.  Physicians that received kickbacks included Dr. Peter Anton,

14   Dr. Emery Chang, Dr. Michael Gottlieb, Dr. Emmanuel Lim, Dr. David

15   McDonough, Dr. Phillip Musikanth, and Dr. Richard Oravec.  Employees of Dr.

16   Mark Honzel and Dr. Jonathan Reitman, Erron Gralore, Eric Lynch and David

17   Cokely, also received kickbacks.  Dr. Gottlieb's spouse received kickbacks.  Dr.

18   Musikanth's significant other received kickbacks.

19   68.    Beginning, it is believed and so it is alleged, by at least the time that

20   she became the SVP, Specialty Pharmacy in 2011, Goodman launched a scheme to

21   reward referring physicians for sending their patients to the Ad-Rx pharmacy (later

22   Kroger Specialty Pharmacy) to have their high-value prescriptions filled.  In

23   actuality, the genesis of this scheme likely predated 2011 and may well have begun

24   earlier, such as when Goodman was Director of Pharmacy.  In return for the referral

25

---

26   [4] The Kroger Specialty Pharmacy website, as it appeared in 2016 and through the end of
     Goodman's employment, can be accessed and viewed on the Internet Archive Wayback
27   Machine, located at www.archive.org.  There are multiple captured examples there
     which show Brenda Goodman as being part of the national "Sales & Leadership Team,"
28   with the title "HIV Team – SVP."

FALSE CLAIMS ACT COMPLAINT - 20

business, the physicians who were "on the take" enjoyed having their own prescriptions filled at the pharmacy at no charge – because their co-pays were waived and any accounts receivable owed to the pharmacy were just written off. The beneficiaries of the kickback scheme extended to those prescribers' spouses and significant others, and their employees.

69.     Goodman also personally benefited from the kickback scheme – separate and apart from the lucrative benefits to her employer. Goodman received very substantial bonuses that were measured by the pharmacy's revenue – much of which was driven directly by the kickback scheme. While it is unknown what amount of bonuses Goodman received prior to 2015, just between 2015 and 2019 she received $383,968.01 in bonuses over and above her salary. A true copy of a chart showing Brenda Goodman's bonus payments between 2015 and 2019, produced by Kroger and stipulated as being true and correct during Goodman's deposition on December 30, 2022, is attached hereto as Exhibit 4.

70.     Among the doctors who received kickbacks in return for referring their patients to Ad-Rx/Kroger Specialty Pharmacy to have their lucrative prescriptions filled, Dr. Emmanuel Lim stood uniquely alone. Between December 1, 2011 and March 29, 2019, Dr. Lim had approximately 2,000 of his own personal prescriptions filled at the Ad-Rx/Kroger Specialty Pharmacy, for which the pharmacy gave Dr. Lim point of sale write-offs, credits, and or A/R write-offs that totaled in excess of $58,000. A true copy of Page 1 (of 92 pages in total) showing Kroger Specialty Pharmacy's "A/R History File Listing" for prescriptions dispensed to Dr. Lim between December 14, 2011 and May 18, 2018, is attached hereto as Exhibit 5. The complete document, of which Page 1 is just an example, shows that Dr. Lim received around 2,000 personal prescriptions filled at Ad-Rx/Kroger Specialty Pharmacy over this timeframe.

71.     A true copy of the chart entitled "Summary of Account Statement Credits and Subsequent AR History Credits," prepared by Plaintiff-Relator's Expert

FALSE CLAIMS ACT COMPLAINT - 21

Ian Dew and provided to Kroger on December 30, 2022, is attached hereto as Exhibit 6.  This shows that Dr. Lim received kickbacks of at least $58,856.

72.    From 2011 through 2020, Dr. Lim referred patients to Ad-Rx/Kroger Specialty Pharmacy for which the pharmacy received more than $26.5 million in reimbursements from Government health care payors which included Medicare, Medicaid (MediCal), FEHBP, and TRICARE.

73.    From at least December 2011 to the time that he stopped having his own prescriptions filled at the Ad-Rx/Kroger Specialty Pharmacy, Dr. Lim paid not one single dime in co-pays, and all his account balances were written off.

74.    The list of persons, known to have received co-pay waivers and A/R write-offs as part of the kickback scheme engineered by Goodman and approved of by Ad-Rx/Kroger Specialty Pharmacy executive management, as prepared by Plaintiff-Relator's Expert Ian Dew and provided to Kroger on December 30, 2022, is shown below:

### Table 12. Grouped Customer Timeframes.

| Customer | Start of Timeframe | End of Timeframe | Group |
|---|---|---|---|
| ANTON, PETER | 11/30/2011 | 03/30/2016 | |
| COKELY, DAVID | 12/01/2011 | 06/14/2018 | HONZEL |
| FLOWERS, KERRY | 01/03/2012 | 11/01/2018 | MUSIKANTH |
| GORDON, WENDY | 12/01/2011 | 03/28/2019 | GOTTLIEB |
| GOTTLIEB, MICHAEL | 12/01/2011 | 03/28/2019 | GOTTLIEB |
| GRALORE, ERRON | 12/01/2011 | 06/14/2018 | HONZEL |
| HONZEL, MARK | 12/01/2011 | 06/14/2018 | HONZEL |
| LIM, EMMANUEL | 12/01/2011 | 03/28/2020 | LIM |
| LYNCH, ERIC | 12/01/2011 | 06/14/2018 | HONZEL |
| MCDONOUGH, DAVID | 12/01/2011 | 06/29/2015 | |
| MUSIKANTH, PHILLIP | 01/03/2012 | 11/01/2018 | MUSIKANTH |
| ORAVEC, RICHARD | 12/01/2011 | 03/28/2020 | LIM |
| REITMAN, JONATHAN | 12/01/2011 | 06/14/2018 | HONZEL |

75.    At the time he prepared this chart, Expert Dew did not have information about kickbacks given to Dr. Emery Chang, since Kroger belatedly

1  produced Dr. Chang's A/R History and Excel spreadsheet reflecting claims data for

2  medications filled for Dr. Chang's patients, after expert reports were due.

3      76.    Between September 2, 2015 when Dr. Emery Chang received his first

4  medication for free and 2022, Dr. Chang referred patients that filled medications at

5  Kroger pharmacies that resulted in paid claims of $14.2 million.

6      77.    The dollar value of the kickbacks given pursuant to the illegal scheme

7  to high-value prescribers (or to their spouses/significant others and employees, and

8  hence for their benefit) between 2011 and 2019 was $125,707, as determined by

9  Expert Dew is shown below:

**Table 5. Summary of Account Statement Credits and Subsequent AR History Credits.**

| Customer | Statement Date | Cumulative Statement Credits | Subsequent AR Credits | Total Credits |
|---|---|---|---|---|
| ANTON, PETER | 03/02/2015 | $4,517 | $540 | $5,057 |
| COKELY, DAVID | 04/02/2013 | $125 | $- | $125 |
| FLOWERS, KERRY | 07/14/2017 | $1,359 | $30 | $1,389 |
| GOTTLIEB, MICHAEL | 03/30/2018 | $16,039 | $- | $16,039 |
| GRALORE, ERRON | 02/01/2016 | $7,676 | $- | $7,676 |
| LIM, EMMANUEL | 04/27/2018 | $56,450 | $2,406 | $58,856 |
| LYNCH, ERIC | 04/27/2018 | $22,162 | $- | $22,162 |
| MCDONOUGH, DAVID | 01/31/2014 | $6,389 | $757 | $7,146 |
| MUSIKANTH, PHILLIP | 01/03/2017 | $1,915 | $7 | $1,921 |
| ORAVEC, RICHARD | 08/01/2014 | $5,202 | $134 | $5,336 |
| Totals | | $121,834 | $3,873 | $125,707 |

21      78.    The value of kickbacks given to Dr. Chang should be added to this list.

22      79.    The dollar value of the claims caused to be submitted by the Kroger

23  defendants that were tainted by the kickback scheme – or that were based on false

24  statements or false records – was not less than $82 million, prior to required rebates

25  paid by the drug manufacturers to the Governments, as determined by Expert Dew:

**Table 8. Summary of Prescription Data by Prescriber.**

| Prescriber | Number of Prescriptions | Patient Paid Amount | Third Party Paid Amount |
|---|---|---|---|
| (No Prescriber) | 423 | $2,015 | $312,390 |
| ALI, MUMTAZ | 20 | $- | $7,908 |
| ANTON, PETER | 31 | $155 | $2,843 |
| DAVIES, DOUGLAS | 505 | $89 | $1,297,349 |
| FLORES, LOUIS | 3 | $1 | $6 |
| FLORES, WILL | 35 | $21 | $610 |
| GOTTLIEB, MICHAEL | 25,449 | $171,220 | $16,328,768 |
| HONZEL, MARK | 16,394 | $20,861 | $15,880,306 |
| LIM, EMMANUEL | 40,007 | $204,337 | $26,527,806 |
| MCDONOUGH, DAVID | 6,966 | $37,730 | $3,940,276 |
| MUSIKANTH, PHILLIP | 12,096 | $101,112 | $9,543,827 |
| ORAVEC, RICHARD | 993 | $1,350 | $574,933 |
| REITMAN, JONATHAN | 5,971 | $25,098 | $7,723,824 |
| Totals | 108,893 | $563,988 | $82,140,847 |

80.     The value of kickback-tainted claims for prescriptions written and referred by Dr. Chang should be added to this list. With Dr. Chang's numbers added, the dollar value of tainted claims increases to **$96,340,847**.

81.     Goodman has testified that, year upon year, the physicians who were among those receiving kickbacks in the form of co-pay waivers and accounts receivable write-offs were consistently among the top "referral sources" who sent their patients to Ad-Rx/Kroger Specialty Pharmacy to have their expensive HIV/AIDS medications and other expensive drugs filled. This scheme was enormously profitable to the pharmacy.

82.     Each of the persons who received the benefit of the kickbacks given by Kroger defendants – that is, the prescribing physicians, their spouses/significant others, and employees – received some form of document associated with each prescription. For documentation given at the point of sale or delivery of the prescriptions, the document would have shown some notation indicating that no co-pay was required, or if a co-pay was showing, it was understood by all parties to the

FALSE CLAIMS ACT COMPLAINT - 24

illegal transaction that payment of the co-pay was not actually expected or required. Similarly, when end of month statements were sent by Ad-Rx/Kroger Specialty Pharmacy to the kickback beneficiaries, it was understood that payment of the account receivable was not expected or required.

83.    In December 2012, David Cokely – who worked for Dr. Honzel – came to the Ad-Rx pharmacy to pick up his personal prescriptions.  He refused to pay the co-pays, insisting that as an employee of Dr. Honzel, he expected his co-pays to be waived.  The PIC (Ramona Edery) instructed the staff pharmacist to not charge the co-pay.  Goodman was also notified, and Goodman responded in an email that same day sent to Edery and the staff pharmacist to make the co-pay waivers permanent for Cokely (Dr. Honzel's employee), writing "Please make him E-WO…maybe we can get more biz form [sic] him. B".  In that context, "E-WO" meant "exception – write off," meaning to put a code in the pharmacy dispensing system flagging Cokely for co-pay waivers for his own prescriptions.  A true copy of Goodman's email to PIC Ramona Edery and Staff Pharmacist Milton Nassar, dated December 17, 2012, is attached hereto as Exhibit 1.

84.    Likewise, screenshots of the Patient Record account information for other kickback recipients were marked with the letter code "E-WO," indicating that those persons were flagged for co-pay waivers and write-offs.  These included, at minimum, Dr. Lim, Kerry Flowers (Dr. Musikanth's significant other), Erron Gralore (another employee of Dr. Honzel), and Eric Lynch (also an employee of Dr. Honzel).  Dr. Gottlieb's account information included numerous notations of "BD CRTSY ADJ BG," once again meaning an account balance write-off approval by Goodman.  A true copy of these combined screenshots (as a composite) is attached hereto as Exhibit 7.

85.    Ad-Rx, and then Kroger management knew full well about the kickback scheme that was being deployed to generate referrals for the pharmacy. On February 18, 2015 (prior to the Kroger transaction), Goodman sent an email to

COO Dervin, and other senior executives, transmitting the "ADRX adjustments" spreadsheet report for 2013, and also containing the 2015 Month End Patient Adjustments" spreadsheet. Goodman's cover email states in part that the report was of the type that "Barbara used to send out to us before she left," making clear that similar such reports had been sent to management in the past. Among the spreadsheets were several pages with highlighting to show co-pay waivers and write-offs given to high value prescribers, their spouses/significant others, and employees were listed with the billing code "BD CRTSY ADJ BG."

86.    Goodman acknowledged and admitted in her deposition that these abbreviations meant "Bad Debt Courtesy Adjustments Brenda Goodman." None of the persons whose names were highlighted and who were receiving the free, no co-pay medications and account balance write-offs in exchange for lucrative referrals, qualified for hardship waiver write-offs, nor had they asked for such. Instead, the email and its attachment undeniably prove that COO Dervin, and other senior executives, knew about and sanctioned the kickback scheme. Again, Dervin claims to have been employed at that time by Modern HC Pharmacy, Inc. (later known as Kroger Specialty Pharmacy Holdings 2, Inc.), yet his management authority extended to and was exercised across the entire Modern HC Holdings, Inc. (and then later, Kroger Specialty Pharmacy) enterprise. A true copy of Goodman's February 18, 2015 cover email and attachments are attached hereto as Exhibit 2.

87.    Later, in October 2017, after the purchase by Kroger of all the stock of Modern HC Holdings, Inc. and the formation of Kroger Specialty Pharmacy, Kroger's Senior Revenue Cycle Manager (Beverly Harnden) learned of several account arrearages for referring prescribers who were co-pay/account receivable kickback recipients. Ms. Harnden, who did not know about the kickback scheme, sent an email to Goodman and Jeffrey Shore that identified eight of Goodman's kickback recipients who had delinquent account balances. The email was marked "Flag for follow up." These included Dr. Anton, Ms. Flowers, Dr. Gottlieb, Mr.

Gralore, Dr. Lim, Mr. Lynch, Dr. McDonough, and Dr. Musikanth.  A true copy of the referenced email dated October 25, 2017 sent by Ms. Harnden to Goodman and Jeffrey Shore is attached hereto as Exhibit 8.

88.   In April 2018, Ms. Harnden sent another email to Goodman and Shore – again regarding delinquent account balances which happened to correspond only with persons who were beneficiaries of the kickback scheme created by Brenda Goodman.  This time, the list included Dr. Chang, Dr. Lim, Dr. Gottlieb, and Eric Lynch (employee of Dr. Honzel).  Harnden asked Brenda Goodman to contact those persons about paying up their outstanding balances.  However, Brenda Goodman – who was herself the architect of the kickback scheme – did not.  A true copy of the referenced email dated April 2, 2018 sent by Ms. Harnden to Goodman and Jeffrey Shore is attached hereto as Exhibit 9.

**C. Alter Ego Allegations**

89.   At all relevant times herein, the corporate defendants herein were, successively up the chain, the alter egos of one another, from Kroger Specialty Pharmacy CA2, LLC, through Kroger Specialty Pharmacy Holdings 2, Inc., then up through Kroger Specialty Pharmacy Holdings 1, Inc., then up through Kroger Specialty Pharmacy Holdings, Inc., and then finally up through The Kroger Company. A true copy of the Kroger Specialty Pharmacy Organizational Chart: Post-Name Change is attached hereto as Exhibit 10.

90.   More specifically, it is alleged that Kroger Specialty Pharmacy CA2, LLC was merely a conduit for the affairs of the next-tiered Kroger entity above it, and that ultimately all sub-entities of The Kroger Company were beholden to the parent, which controlled and directed their operations.  The corporate existence of Kroger Specialty Pharmacy CA2, LLC, and other successive upstream entities should therefore be disregarded in equity and for the ends of justice because such disregard is necessary to avoid fraud and injustice to the real parties in interest, the United States and the State of California.  Stated bluntly, the "separate corporate

existence" of Kroger Specialty Pharmacy CA2, LLC, Kroger Specialty Pharmacy
Holdings 2, Inc., Kroger Specialty Pharmacy Holdings 1, Inc., and Kroger Specialty
Pharmacy Holdings, Inc., was a fiction.

91.     Through discovery in Case No. 17-cv-2141, Plaintiff-Relator learned
that The Kroger Company established a virtual rabbit warren of wholly-owned
subsidiary entities intended for little or no other purpose but to confuse, obfuscate,
and attempt to unjustly cabin liability of the upstream entities (up to and including
The Kroger Company) from their wholly owned subsidiaries below – extending
downward to Kroger Specialty Pharmacy CA2, LLC, which was "ground zero" for
the fraud schemes alleged herein.

92.     Those upstream entities both facilitated and caused the submission of
false claims for payment and/or claims based on false records and statements.
Additionally, they each were participants in the conspiracy to commit violations of
the FCA.

93.     Yet, the Kroger entities (and most certainly at least up through Kroger
Specialty Pharmacy Holdings 1, Inc., the entity that was absorbed into Kroger as a
result of the July 2016 financial transaction) were 100% owned by upstream entities
and ultimately by The Kroger Company.

94.     According to documentation of the July 2016 financial transaction, the
component entities of Modern HC Holdings, Inc. (which became Kroger Specialty
Pharmacy Holdings 1, Inc.) were all disregarded entities or 100% owned
subsidiaries for tax purposes.  None of those entities filed their own tax returns and
instead were merely a subsidiary part of a consolidated group of entities essentially
operating as one – both in fact and as represented to the public.

95.     Further, on information and belief, and according to documentation of
the July 2016 financial transaction, Modern HC Holdings, Inc. (and hence, later the
Kroger entities after the stock purchase closed) guaranteed the leases of the wholly
owned subsidiaries.

FALSE CLAIMS ACT COMPLAINT - 28

96.    The authorized signers for all bank accounts for every single one of the Modern HC Holdings, Inc. group of companies were exactly the same persons.

97.    According to The Kroger Company's July 20, 2016 press release regarding the transaction, its purpose in buying up all the shares of Modern HC Holdings, Inc. was to "create a combined specialty pharmacy that will operate as a wholly-owned subsidiary of The Kroger Co." And indeed, that is just what happened. A true copy of The Kroger Company's July 20, 2016 press release is attached hereto as Exhibit 3.

98.    Prior to this transaction, Kroger Specialty Pharmacy CA2, LLC and all sibling and parent LLCs and corporations were run as a single, unified entity. After the transaction, the same held true except that the combined entity was ultimately then owned by The Kroger Company and was run as a nationwide specialty pharmacy known simply as Kroger Specialty Pharmacy. These entities were all run out of the same corporate offices from the same corporate campus in Lake Mary, Florida. And for a large number of these entities, there were shared and overlapping officers and directors. Just as with the necessity for lease guaranties, the subsidiary entities were not financially or managerially separate from their upstream masters.

99.    Defendant Dervin, the COO of Modern HC Holdings, Inc. prior to the transaction and who continued to be the COO of the new Kroger Specialty Pharmacy, at first claimed in his deposition that he did not even know who his employer was. However, when he saw tax records, including records that he profited in the millions of dollars from the transaction, he then said that he worked for a "holding" company (as opposed to an operating company) – being Kroger Specialty Pharmacy Holdings 2, Inc. Yet, he also testified that all the Kroger Specialty Pharmacy entities reported to and through him.

100.    Specifically, when asked directly, Dervin admitted under oath that his management responsibilities as COO of Kroger Specialty Pharmacy extended to pharmacy locations in Tennessee, Mississippi, and Puerto Rico – even though those

entities did not fall under the chain of command of the Kroger entity that purportedly signed his paycheck, thus proving that Kroger's "Organizational Chart: Post-Name Change" was a sham and that the downstream entities were just mere conduits of Kroger Specialty Pharmacy Holdings, Inc., if not the mothership, The Kroger Company, itself. A true copy of a document entitled "Kroger Specialty Pharmacy Organizational Chart: Post-Name Change" is attached hereto as Exhibit 10. A true copy of excerpts from the deposition of Tom Dervin, taken on January 4, 2023, wherein he admitted that his span of control and scope of responsibilities extended to all pharmacies and all locations referenced on "Kroger Specialty Pharmacy Organizational Chart: Post-Name Change" (being entities below "The Kroger Company") is attached hereto as Exhibit 11.

101.   Dervin was fully aware of the kickback scheme that had been engineered by Goodman, and by his actions and inactions, he approved of it.

102.   After the July 2016 financial transaction, the Kroger entities continued to project that Kroger Specialty Pharmacy was a single, unified entity operating nationwide specialty pharmacies from central Florida. By way of example, all executives used email addresses and business cards that simply read "Kroger Specialty Pharmacy" regardless of which legal entity was named on their W-2s. Further, the combined, unified entities of "Kroger Specialty Pharmacy" all enjoyed using the same national website – without any delineation at all that they might possibly be a confederation of separate LLCs or companies. A true copy of two examples of such business cards showing unified management and – essentially – unity of operations, interests, and ownership – is attached hereto as Exhibit 12.

103.   When Plaintiff-Relator needed approval for a part-time position at another pharmacy, he had to seek and obtain permission from CAO Joan Schuckenbrock. Like COO Dervin and CEO Don Meffe, CAO Schuckenbrock worked for another Kroger entity than Plaintiff-Relator, but in fact she had the same CAO responsibilities across the entire enterprise. A true copy of an organizational

FALSE CLAIMS ACT COMPLAINT - 30

chart describing the "Management" of Axium Pharmacy Holdings, Inc. including Schuckenbrock, Dervin and Meffe is attached as Exhibit 13.

104.    On September 2, 2016, CEO Dom Meffe wrote an email to all employees that began by saying: "I am pleased to confirm that the merger announced by Kroger on July 20th to bring Axium and Modern Health together to *form one larger and stronger specialty pharmacy organization* has closed successfully." (emphasis added).  A true copy of this September 2, 2016 email is attached hereto as Exhibit 14.

105.    While The Kroger Company purports to operate through a vast network of divisions, units, and subsidiary entities, at least with regard to the business line known as "Kroger Specialty Pharmacy," that is operated as a single and unified entity that is run out of a single office whose address is 3200 Lake Emma Road, Suite 1000, Lake Mary, Florida 32746.  This location is owned by and titled in the name of The Kroger Company, and it purports to house several subsidiaries - which share this same address.  It is from this location that The Kroger Company operates what it has admitted is a national "combined specialty pharmacy."  Further, on information and belief, The Kroger Company from time to time sends communications, such as emails, memoranda, and policy codes, that are directives of the parent, The Kroger Company (through its officers, agents, servants, and employees), to pharmacists and employees of lower-tiered "subsidiaries" down to the store level – thus showing meaningful and actual management authority and control over those business units and that the subsidiaries are dependent on the parent and are not truly independently run or managed.

106.    Thus, on information and belief, and based on evidence obtained in Case No. 17-cv-2141, it is alleged that the Kroger defendant entities here (with the possible exception only of the ultimate parent, The Kroger Company) were financially dependent on their upstream and/or parent entities and thus were "mere conduits," that did not operate as separate companies, did not maintain separate

FALSE CLAIMS ACT COMPLAINT - 31

1    corporate existence, and did not respect normal corporate formalities.  Hence, all the
2    defendant entities should be found to be the alter egos of each other, and their
3    alleged corporate separateness should be disregarded.

4         107.   Lastly, the second prong required for finding alter ego liability to be
5    applied exists here in abundance – that is, that an inequitable and unjust result would
6    ensue if the acts in question are treated as merely those of the lowest subsidiary
7    corporation alone.  To cite just a few examples, it would be grossly inequitable and
8    unjust that the Kroger defendants could escape liability for frauds and deceits
9    perpetrated by their own agents, servants and employees (i.e., Goodman and Dervin,
10   at the least), who engineered and approved of the kickback fraud scheme when both
11   they themselves, and other Kroger employees, knew full well that their conduct in
12   doing so was corrupt, unethical, and illegal.  And it would be inexcusably
13   inequitable and unjust that the Government payors – and the taxpayers – would have
14   to bear this loss and that these defendants would not be held accountable as co-
15   conspirators and under the theory of alter ego liability for the damages for which
16   they are entirely responsible.

17        108.   The inequity and injustice lies, clearly and simply, in the fact that the
18   Governments paid out over $75 million in false claims that were tainted by
19   kickbacks.

20        109.   Beyond that, inequity and injustice lies further in the fact that, when
21   Kroger learned that a federal FCA lawsuit had been brought against Kroger
22   Specialty Pharmacy CA2, LLC, and Kroger Specialty Pharmacy, Inc., Kroger then
23   surreptitiously and in bad faith "killed off" Kroger Specialty Pharmacy CA2, LLC
24   in an effort to run from accountability for its fraud.  Kroger did this by terminating
25   the legal existence of Kroger Specialty Pharmacy CA2, LLC in Delaware (the State
26   of its formation) and by cancelling its authorization in California – both done almost
27   immediately after Kroger learned of the Government's initial decision to decline
28   intervention.  Yet, having done that, Kroger never openly informed either the Court

FALSE CLAIMS ACT COMPLAINT - 32

1    or the Plaintiff-Relator until far into discovery and well past the time that Plaintiff-

2    Relator could have amended the operative complaint.

3    **D. False Claims, Statements, Certifications, and Materiality**

4    110.    The foregoing described conduct by the named Kroger defendants, the

5    named individual defendants, and by Kroger Specialty Pharmacy CA2, LLC, was in

6    violation of the FCA and the CFCA.

7    111.    The foregoing described conduct by the named Kroger defendants, the

8    named individual defendants, and by Kroger Specialty Pharmacy CA2, LLC, was in

9    violation of the AKS and Stark, and were therefore also *per se* violations of the FCA

10   and the CFCA.

11   112.    Each of the Defendants in this action caused false claims to be

12   submitted to Government payors for payment.

13   113.    Each of the Defendants in this action caused false claims to be

14   submitted to Government payors for payment based upon false records and false

15   statements.

16   114.    Each of the Defendants in this action conspired with one another,

17   directly or indirectly, to violate the FCA and the CFCA.

18   115.    Compliance with all federal healthcare laws and regulations by the

19   named Kroger defendants, the named individual defendants, and by Kroger

20   Specialty Pharmacy CA2, LLC, was required – both in the claims submitted and

21   caused to be submitted, and in the provider agreements executed by each defendant

22   and by Kroger Specialty Pharmacy CA2, LLC, all of which incorporated both

23   express and implied certifications of compliance with, among other things, AKS and

24   Stark.  Compliance in this regard was material to the Government payors' decision

25   to pay those claims.

26   116.    The United States and the State of California materially relied upon

27   what they believed to be truthful certifications of compliance and that claims

28   submitted were not tainted by kickbacks or by false records or statements presented

FALSE CLAIMS ACT COMPLAINT - 33

in support of false claims.

117.   The United States and the State of California did not know that the claims for payment (as described above) were tainted by kickbacks and did not know that the claims were based upon false records or statements.

118.   Had the United States and the State of California known the truth regarding such claims, that is, had those payors known the truth that the claims and records described herein were tainted by kickbacks, those claims would not have been paid.

119.   The United States and the State of California have been damaged by Defendants' conduct in amounts to be shown by the evidence and proven at trial, and to recover three times those damages together with all civil penalties to which the Government payors are entitled.

## COUNT I

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

120.   Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

121.   As detailed above, Defendants knowingly made or presented, or caused to be made or presented, claims to Federal health care programs that were false or fraudulent in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), because the claims were tainted by kickbacks and submitted in violation of Stark.

122.   By virtue of the false or fraudulent claims that Defendants made or presented, or caused to be made or presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

123.   Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

124.   As detailed above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

125.   By virtue of the false records or statements Defendants made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

126.   Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

127.   As detailed above, the Kroger Defendants and Defendants Goodman and Dervin, and the high-value prescribers, including Defendants Lim and ERL, that received kickbacks, knowingly conspired with each other, to receive disguised kickbacks in the form of co-pay waivers and account write-offs for the personal medications of high-value prescribers, their spouses, significant others, and employees, resulting in the submission of false claims tainted by violations of AKS and Stark, which claims would not have been payable had Defendants truthfully disclosed the kickback relationships.

128.   As a result of the conspiracy's acts, the United States has been severely damaged the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT IV

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

129.   Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

130.   As detailed above, the Kroger Defendants violated 31 U.S.C. § 3729(a)(1)(G) when it (a) knowingly made, used, and caused to be made or used, false records and statements material to an obligation to pay or transmit money or

property to the Government, and (b) knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to repay Medicare overpayments to which it was not entitled.

131.   Had CMS been aware of the knowing failure to return overpayments, it would have taken steps to recover them.

132.   By virtue of the alleged acts of concealment and/or improper avoidance, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT V

### California False Claims Act, Cal. Gov. Code § 12651(a)(1)

133.   Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

134.   By virtue of the acts detailed above, Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to California in violation of the California False Claims Act, Cal. Gov. Code § 12651(a)(1); that is, Defendants knowingly made or presented, or caused to be made or presented, to California claims for payment that were tainted by illegal kickbacks.

135.   By virtue of the false or fraudulent claims Defendants caused to be presented, California has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT VI

### California False Claims Act, Cal. Gov. Code § 12651(a)(2)

136.   Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

137.   As detailed above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in

violation of the California False Claims Act, Cal. Gov. Code § 12651(a)(2).

138.  By virtue of the false records or statements Defendants made, used, or caused to be made or used, California has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT VII

### California False Claims Act, Cal. Gov. Code § 12651(a)(3)

139.  Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

140.  As detailed above, the Kroger Defendants and Defendants Goodman and Dervin, and the high-value prescribers, including Defendants Lim and ERL, that received kickbacks, knowingly conspired with each other, to receive disguised kickbacks in the form of co-pay waivers and account write-offs for the personal medications of high-value prescribers, their spouses, significant others, and employees, resulting in the submission of false claims tainted by violations of AKS and Stark, which claims would not have been payable had Defendants truthfully disclosed the kickback relationships.

141.  As a result of the conspiracy's acts, the State of California has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT VIII

### California False Claims Act, Cal. Gov. Code § 12651(a)(7)

142.  Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

143.  As detailed above, the Kroger Defendants violated Cal. Gov. Code § 12651(a)(7) when it (a) knowingly made, used, and caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the State, and (b) knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State

1   by failing to repay MediCal overpayments to which it was not entitled.

2       144.   Had MediCal been aware of the knowing failure to return

3   overpayments, it would have taken steps to recover them.

4       145.   By virtue of the alleged acts of concealment and/or improper

5   avoidance, the State has suffered actual damages and is entitled to recover treble

6   damages plus a civil monetary penalty for each false claim.

7                          **Prayer for Relief**

8   WHEREFORE, Relator demands and prays for the following relief:

9       1.   That judgment be entered in favor of the United States and against

10          Defendants on Counts I through IV for the amount of the United States'

11          damages, trebled as required by law, and such civil penalties as are

12          required by law, together with all such further relief as may be just and

13          proper;

14      2.   That judgment be entered in favor of California and against Defendants

15          on Counts V through VIII for the amount of California's damages,

16          trebled as required by law, and such civil penalties as are required by

17          law, together with all such further relief as may be just and proper;

18      3.   An award to the Relator of a percentage of the proceeds of the action in

19          accordance with 31 U.S.C. § 3730(d) and Cal. Gov. Code

20          § 12652(f)(2);

21      4.   An award to the Relator of his costs and reasonable attorneys' fees for

22          prosecuting this action pursuant to 31 U.S.C. § 3730(d) and Cal. Gov.

23          Code § 12652(f)(8); and

24      5.   All other relief as may be required or authorized by law and in the

25          interests of justice.

26                         **Demand for Jury Trial**

27      Relator, on behalf of himself, the United States, and the State of California

28   demands a jury trial on all claims alleged herein.

FALSE CLAIMS ACT COMPLAINT - 38

1  Dated: September 1, 2023              Respectfully submitted,

2                                        EDWIN GVALEVECH

3                                        By his attorneys

4                                        */s/ Louis J. Cohen*
                                         LOUIS J. COHEN
5                                        Louis J. Cohen, a Professional Corporation
6                                        28720 Roadside Drive, Suite 273
                                         Agoura Hills, CA 91301
7                                        Tel: (818) 889-5777
8                                        Fax: (818) 991-6999
                                         Email: louis@louiscohenlaw.com
9

10                                       CHARLES H. RABON, JR.
                                         Rabon Law Firm, PLLC
11                                       413 S. Sharon Amity Road, Suite C
12                                       Charlotte, NC 28211
                                         Tel.: (704) 247-3247
13                                       Fax: (704) 208-4645
14                                       Email: crabon@usfraudattorneys.com
                                         *Pro Hac Vice Application to be Filed*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

FALSE CLAIMS ACT COMPLAINT - 39

# EXHIBIT 1

| | |
|---|---|
| **From:** | Brenda Goodman |
| **Sent:** | Monday, December 17, 2012 8:48 PM |
| **To:** | Ramona Edery |
| **Cc:** | Milton Nassar |
| **Subject:** | RE: DAVID COKELY |
| | |
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Completed |

Please make him E-WO....maybe we can get more biz form him.
B

Brenda Goodman
Senior Vice President, Specialty Pharmacy
110 East Huntington Drive
Monrovia, CA 91016
Tel: 626-932-1608
Cell: 323-868-7550
bgoodman@modernhealthinc.com

-----Original Message-----
From: Ramona Edery
Sent: Monday, December 17, 2012 11:18 AM
To: Brenda Goodman
Cc: Milton Nassar
Subject: DAVID COKELY

He told Milton because he works at Dr. Honzel's office he doesn't want to pay copays. (████████████).

What would you like to do? If we don't charge him his copays we lose $10 on 36034277, $4 on 34006428, $2 on 36035972, and $17 on 34006427

Ramona Edery
Pharmacist in Charge/Pharmacy Manager
ADRX Pharmacy
6240 Wilshire Blvd.
Los Angeles, CA 90048
Tel:323.936.8221
Fax:323.936.0312
redery@modernhealthinc.com

1

EXHIBIT
Goodman
12/16/22

# EXHIBIT 2

| From: | Brenda Goodman |
| --- | --- |
| Sent: | Wednesday, February 18, 2015 6:00 PM |
| To: | Jeffrey Shore; Rosemary McDermott; Tom Dervin |
| Cc: | Ramona Edery |
| Subject: | FW: ADRX Monthly Adjustments for May 2013 |
| Attachments: | ADRX Adjustments for 2013.xls; 2015 Month End Patient Adjustments.xls |
| | |
| Follow Up Flag: | Flag for follow up |
| Flag Status: | Completed |

Morning,

Attached please see the ADRX adjustments that Barbara used to send out to us before she left.

I took Mario's report and cross referenced it, highlighted in yellow those that are legacy, also added those that are doctors, doctors and HIV clients, work in doctor's offices and

Significant others

The rest should be sent FAA forms if they are not ADAP or MEDICAL

Please let me know if you have any questions

Thanks

Brenda


Brenda Goodman
Senior Vice President, Specialty Pharmacy
7373 Lincoln Way
Garden Grove, CA, 92841
Tel:626-932-1608
Cell:323-868-7550
Brenda.goodman@modernhealthinc.com

**From:** Barbara Corrales
**Sent:** Monday, June 03, 2013 10:30 AM
**To:** Sherri Cherman; Michelle Williams; Brenda Goodman
**Subject:** ADRX Monthly Adjustments for May 2013

Good Morning,

Here is the spreadsheet for the ADRX monthly adjustments.

Please let me know if you have any questions.

Thank you.

Modern**HEALTH**

1



Confidential

## ADRX Write-Offs for 2013

| QS1 Code | Patient Name | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 |
|---|---|---|---|---|---|---|
| AL |  |  | $10.00 | $11.15 | $10.00 |  |
| AM |  |  |  | $3.45 | $19.70 | $19.70 |
| AN |  | $80.55 | $80.55 | $80.55 | $104.50 | $164.68 |
| AV |  | $5.14 |  | $4.36 | $4.36 | $4.10 |
| BA |  |  |  |  |  | $6.00 |
| BA |  | $12.00 |  | $12.00 | $12.00 |  |
| BA |  |  |  |  |  |  |
| BE |  |  |  |  |  |  |
| BE |  | $32.29 | $799.28 | $29.95 |  | $659.80 |
| BO |  |  |  |  |  |  |
| BO |  |  |  |  |  |  |
| BR |  |  |  |  |  |  |
| BU |  |  |  |  |  |  |
| BU |  |  |  | $3.50 |  |  |
| CA |  |  |  |  |  |  |
| CA |  |  |  | $26.40 | $19.80 |  |
| CA |  | $125.00 | $70.00 | $70.00 | $70.00 | $70.00 |
| CA |  |  |  | $5.00 | $5.00 | $20.00 |
| CH |  | $20.00 |  |  | $10.00 | $10.00 |
| CH |  | $5.66 | $18.25 | $4.47 | $15.24 | $15.24 |
| CH |  |  |  | $3.50 |  |  |
| CL |  |  |  | $19.70 |  | $20.90 |
| CL |  |  |  |  | $2.65 | $2.65 |
| CO |  |  | $50.00 | $20.00 |  |  |
| CO |  | $335.89 | $448.32 |  |  |  |
| CO |  |  |  |  |  |  |
| CU |  |  |  |  |  |  |
| DA |  | $8.60 | $183.76 | $2.65 | $194.69 | $199.99 |
| DA |  |  |  | $13.95 | $3.50 |  |
| DE |  |  |  | $15.00 | $10.30 | $7.65 |
| DE |  |  |  | $5.80 |  |  |
| DE |  | $996.19 | $1,019.01 | $86.96 |  |  |
| ED |  |  |  | $7.00 |  |  |
| ER |  | $12.99 | $12.99 | $12.99 | $14.02 | $14.07 |
| FE |  | $2.30 | $0.25 | $28.93 | $28.68 | $28.68 |
| FL |  |  |  | $3.95 |  |  |
| FL |  |  |  |  | $82.19 |  |
| FO |  |  |  | $29.66 |  |  |
| FR |  |  |  |  |  |  |
| GA |  | $925.46 | $1,106.88 | $999.91 | $121.97 | $148.47 |
| GI |  |  |  |  |  |  |
| GO |  |  |  |  |  |  |



EXHIBIT 12
Goodman
12/16/22
PENGAD 800-631-6989

| Name | | | | | |
|---|---|---|---|---|---|
| GOT■■■ | $720.25 | | $244.27 | $408.02 | $131.06 |
| GOT■■■ | | $114.55 | | | |
| GRA■■■ | $58.91 | $58.82 | $53.91 | $53.91 | $51.90 |
| HAI■■■ | | | | $11.94 | $7.63 |
| HAI■■■ | $277.93 | $319.11 | $345.97 | $370.47 | $328.94 |
| HEE■■■ | | | | $10.48 | $15.72 |
| HEE■■■ | | | | | |
| HEE■■■ | | | | | |
| HEE■■■ | | | | | |
| HEE■■■ | | | $30.23 | | |
| HOW■■■ | $2.29 | $2.29 | $2.27 | $2.27 | $2.27 |
| HUI■■■ | | | | | |
| JEF■■■ | | | $15.05 | $5.80 | |
| JON■■■ | | | $9.30 | | |
| KHA■■■ | | $50.00 | $25.00 | | |
| KIS■■■ | $29.05 | | | | |
| KNA■■■ | | | | | |
| LAR■■■ | $24.64 | | | $2.65 | |
| LIM■■■ | $3,160.64 | $895.20 | $696.60 | $272.84 | |
| LOR■■■ | $50.00 | | | | |
| LYN■■■ | $335.00 | $325.00 | $314.91 | $145.00 | $185.00 |
| MA■■■ | $410.00 | $220.00 | $220.00 | $258.16 | $233.16 |
| MA■■■ | | | | $37.03 | $9.13 |
| MA■■■ | | | | | |
| MC■■■ | $145.00 | | | $482.80 | $97.71 |
| MO■■■ | | $245.00 | $185.00 | $110.00 | |
| MO■■■ | | | | | |
| MU■■■ | $33.95 | | | $86.55 | |
| ORA■■■ | $135.00 | $135.00 | $135.00 | $135.00 | $135.00 |
| PAD■■■ | $55.00 | $70.00 | $115.00 | $55.00 | $115.00 |
| PAO■■■ | | | | | |
| PET■■■ | | | $4.65 | | |
| PIM■■■ | $0.77 | | | | |
| PLU■■■ | | | $10.45 | | |
| PRA■■■ | | | | | |
| QUI■■■ | $26.76 | $1.55 | $8.36 | $1.55 | $4.86 |
| RAM■■■ | $12.80 | | $11.65 | | |
| RAM■■■ | $5.94 | $5.94 | $5.94 | $5.45 | $5.45 |
| RAM■■■ | | | $7.00 | | |
| REG■■■ | | | | | |
| RIN■■■ | $8.15 | | $1.15 | $7.00 | |
| RIV■■■ | | | | | |
| ROD■■■ | | | | | |
| ROL■■■ | | | | | $27.40 |
| RUS■■■ | | | | | |



| | | | | | |
|---|---|---|---|---|---|
| SA | | | | | |
| SA | | | | | |
| SA | | | | | |
| SA | | | | | |
| SC | | | | | |
| SC | $4.02 | $4.02 | $4.02 | $4.02 | $4.02 |
| SE | | | | | |
| SE | | | | | |
| SIN | | | | | |
| ST | $2.23 | $2.23 | $2.23 | $2.23 | $2.23 |
| SU | | | | | |
| SU | | | $25.79 | $25.79 | |
| TO | | | | | |
| TR | | | | | |
| VE | | | | | |
| VE | | | | | |
| WI | | | | | |
| WI | | | $24.44 | | |
| WI | | | | | |
| WC | | | | | |
| ZA | | $125.53 | $16.80 | | |
| **Monthly Total** | $8,060.40 | $6,373.53 | $4,015.82 | $3,222.56 | $2,748.41 |
| **Patient Count** | 34 | 27 | 49 | 39 | 32 |

# ADRX Hardship Patients- 2015
## (BD HARDSHIP)

| Patient | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MC | $4.48 | | | | | | | | | | | |
| DEB | | | | | | | | | | | | |
| RAI | $22.45 | | | | | | | | | | | |
| DIA | $16.80 | | | | | | | | | | | |
| ROI | $29.01 | | | | | | | | | | | |
| CRI | $2.40 | | | | | | | | | | | |
| RAN | | | | | | | | | | | | |
| ALI | | | | | | | | | | | | |
| ALI | | | | | | | | | | | | |
| VEI | | | | | | | | | | | | |
| ROI | $26.20 | | | | | | | | | | | |
| REH | $7.35 | | | | | | | | | | | |
| QUI | $23.32 | | | | | | | | | | | |
| PRI | $14.40 | | | | | | | | | | | |
| LUI | | | | | | | | | | | | |
| LOI | | | | | | | | | | | | |
| JUI | $36.52 | | | | | | | | | | | |
| HAI | $3.60 | | | | | | | | | | | |
| FUI | $46.92 | | | | | | | | | | | |
| FRI | $12.00 | | | | | | | | | | | |
| DEI | | | | | | | | | | | | |
| CHI | | | | | | | | | | | | |
| BRI | $177.52 | | | | | | | | | | | |
| BLI | | | | | | | | | | | | |
| BEI | | | | | | | | | | | | |
| ARI | | | | | | | | | | | | |
| ADI | $20.30 | | | | | | | | | | | |
| STI | | | | | | | | | | | | |
| JAC | | | | | | | | | | | | |
| LAI | $38.44 | | | | | | | | | | | |
| TRI | $3.60 | | | | | | | | | | | |
| TEI | | | | | | | | | | | | |
| OCI | $58.88 | | | | | | | | | | | |
| CRI | $70.22 | | | | | | | | | | | |
| ROI | $23.56 | | | | | | | | | | | |
| REN | $22.10 | | | | | | | | | | | |
| FIE | | $18.00 | | | | | | | | | | |
| WAI | | | | | | | | | | | | |
| KEI | | | | | | | | | | | | |

EXHIBIT 13
Friedman
12/16/22
PENGAD 800-631-6989



## ADRX Write off Patients- 2015
### (BD CRTSY ADJ BG)

| HME [SOC] | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LI | | | | | | | | | | | | |
| LI | $18.00 | | | | | | | | | | | |
| M | $2,090.62 | | | | | | | | | | | |
| BE | $45.00 | | | | | | | | | | | |
| AI | $7,277.85 | $1,998.10 | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | | | | | | | | | | | | |
| AL | $6.72 | | | | | | | | | | | |
| AM | | | | | | | | | | | | |
| AN | $308.65 | MD AND CLIENT | | | | | | | | | | |
| AN | $85.69 | | | | | | | | | | | |
| AV | | | | | | | | | | | | |
| BA | | | | | | | | | | | | |
| BA | | | | | | | | | | | | |
| BE | $11.44 | | | | | | | | | | | |
| BR | | | | | | | | | | | | |
| BU | | | | | | | | | | | | |
| CA | | | | | | | | | | | | |
| CA | | | | | | | | | | | | |
| CA | $64.93 | | | | | | | | | | | |
| CA | | | | | | | | | | | | |
| CI | | | | | | | | | | | | |
| CI | | | | | | | | | | | | |
| CI | | | | | | | | | | | | |
| CI | $822.57 | | | | | | | | | | | |
| CO | | | | | | | | | | | | |
| CO | | | | | | | | | | | | |
| CO | $13.88 | S/O | | | | | | | | | | |
| CU | $19.20 | | | | | | | | | | | |
| DA | | | | | | | | | | | | |
| DE | | | | | | | | | | | | |
| DE | | | | | | | | | | | | |
| DE | | | | | | | | | | | | |
| DI | | | | | | | | | | | | |



| Row | Amount | Note |
|---|---|---|
| EI | $12.59 | |
| ER | $38.88 | |
| FFE | $11.09 | |
| FL | $22.86 | S/0 |
| FC | $11.11 | |
| G/ | $963.88 | |
| GI | $411.57 | MD |
| GC | $243.96 | DR OFFICE |
| GF | $1.60 | |
| H/ | $236.03 | |
| HI | $6.00 | |
| HI | $27.43 | |
| HI | | |
| HI | $8.40 | |
| HI | $24.61 | |
| JE | $10.80 | |
| JO | | |
| KI | $9.25 | $23.40 |
| RI | $219.51 | $22.80 |
| AN | | $19.08 |
| N | | $10.00 |
| KI | | |
| M | | |
| TI | | |
| F/ | $71.72 | |
| L/ | $30.80 | |
| LI | $4,601.50 | MD |
| LC | | |
| LN | $295.01 | DR OFFICE |
| M | $221.40 | |
| M | | |
| M | | |
| M | | MD |
| M | $13.80 | |
| M | | |
| M | $1,435.20 | MD |
| O | | MD AND CLIENT |
| P/ | | |



| | DE | PB | BO | CH | LY |
|---|---|---|---|---|---|
| | $91.28 | $6.99 | $166.05 | | $10,862.77 |
| | | | | | $541.33 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |

# EXHIBIT 3

# Kroger Announces Merger of Axium Pharmacy and Modern HC Holdings to Create a Combined Specialty Pharmacy

Kroger Expands Presence in High-Growth Specialty Pharmacy Market



NEWS PROVIDED BY
**The Kroger Co.** →
20 Jul, 2016, 12:05 ET

CINCINNATI and ORLANDO, Fla., July 20, 2016 /PRNewswire/ -- The Kroger Co. (NYSE: KR) today announced an agreement for Axium Pharmacy Holdings, Inc. ("Axium") to acquire the outstanding shares of Modern HC Holdings, Inc. ("ModernHEALTH"), a leading specialty pharmacy, to create a combined specialty pharmacy that will operate as a wholly-owned subsidiary of The Kroger Co.

"This strategic investment will accelerate the growth of Kroger's health and wellness business," said Robert Clark, Kroger's senior vice president of merchandising. "Expanding our specialty pharmacy services will provide our customers with greater access to medications we don't currently dispense and access to additional services without going to another pharmacy."

ModernHEALTH, based in Orlando, is one of the nation's largest independent providers of specialty pharmacy services. The company employs approximately 500 associates who provide comprehensive specialty pharmacy services including IVIG for patients who require IV-based therapies for autoimmune and primary immune deficiency diseases, and comprehensive medication management for HIV, Cystic Fibrosis, Transplant, Hepatitis C, Rheumatoid Arthritis and Dermatology.

Kroger is a leading provider of health and wellness services. Kroger operates 2,230 pharmacy locations and195 The Little Clinic locations. The company's pharmacists also provide health coaching, biometric screening and other wellness services designed to deliver positive health outcomes for patients. Axium, which became a wholly-owned subsidiary of Kroger in 2012, is one of the nation's largest independent providers of specialty pharmacy services, offering a range of clinical services to patients with complex chronic conditions.

The transaction is subject to certain regulatory approvals, including from the FTC. Financial terms were not disclosed.

**Operational Profile**

Kroger pharmacy is currently the fifth-largest pharmacy operator in the U.S. and specialty pharmacy is the primary area of growth in pharmaceuticals. Merging ModernHEALTH and Axium into a combined specialty pharmacy should improve purchasing efficiencies and allow the companies to combine each other's payer strategies to bring down costs. The combination will also allow Kroger's specialty pharmacy business to expand into new territories in the West and Southwestern U.S., and expand offerings to other disease states.

"Combining Axium and ModernHEALTH's expertise with Kroger's health and wellness services will allow Kroger to both serve more customers who require complex drug therapies, and deliver those therapies at greater value to customers and insurance payers," said Mr. Clark. "The merger adds IVIG services to Kroger's specialty pharmacy capabilities, servicing patients who require IV-based therapies for autoimmune and primary immune deficiency diseases, and also expands our ability to serve more patients requiring complex therapies for Cystic Fibrosis and Rheumatoid Arthritis."

ModernHEALTH is comprised of several business segments that provide highly-specialized services, including: TLCRx Pharmacy, with locations in New Orleans, Orlando and Addison, TX, primarily providing services to patients in Rheumatology, Dermatology, Hepatitis C and Cystic Fibrosis; Biofusion, based in Torrance, CA, serving patients requiring Subcutaneous Immune Globulin (SCIG) and IV Immune Globulin (IVIG) for autoimmune and primary immune deficiency diseases; ModernHEALTH Specialty Pharmacy, with two sites in Southern California, focusing on HIV, Transplant and Cystic Fibrosis therapies; and two home infusion pharmacies in Dothan, AL and Richardson, TX.

Headquartered in Lake Mary, Florida, Axium employs 300 associates who provide a range of clinical services to patients with complex chronic conditions through locations in California, Puerto Rico, Tennessee and Mississippi. Axium provides drug therapies and patient-support services to treat chronic, genetic and other complex medical conditions such as cancer, Hepatitis C, Rheumatoid Arthritis, Multiple Sclerosis and numerous other chronic care conditions.

Headquarters for the combined specialty pharmacy will be located in a new facility under construction in Lake Mary, FL, with continued support from existing facility locations. The combined organization will employ approximately 800 associates and will continue to operate as an independent company within the Kroger family.

"We are very excited to welcome ModernHEALTH's leadership team and all 500 current associates to the Kroger family," said Mr. Clark.

"Our partnership with Kroger and Axium will enable us to provide more customers in more places with the critical specialty pharmacy services they need," said Dom Meffe, ModernHEALTH's CEO. "We believe this relationship will create efficiencies, accelerate growth in the high-growth specialty pharmacy market, and improve the overall quality of our combined healthcare services. We are also pleased that this partnership means our business headquarters will remain and grow in Orlando."

With over 20 years of experience in the specialty pharmacy space, Mr. Meffe will lead the new combined business as CEO after close. Before leading ModernHEALTH, Mr. Meffe was founder and CEO of Curascript Pharmacy, a company he led before selling to Express Scripts.

Axium's CEO, Mark Montgomery, will help ensure a smooth transition after the merger closes. His future plans will be announced at a later date. Mr. Montgomery has been with Axium for 13 years, the last 10 as president and CEO. With nearly 30 years of healthcare leadership experience, he has held instrumental management roles with multiple leading nationwide specialty pharmacy providers.

Jefferies LLC served as ModernHEALTH's financial advisor, and Ropes and Gray LLP acted as ModernHEALTH's legal advisor. Jones Day acted as legal advisor to Kroger.

Every day, the Kroger Family of Companies makes a difference in the lives of eight and a half million customers and 431,000 associates who shop or serve in 2,778 retail food stores under a variety of local banner names in 35 states and the District of Columbia. Kroger and its subsidiaries operate an expanding ClickList offering – a personalized, order online, pick up at the store service – in addition to 2,230 pharmacies, 785 convenience stores, 323 fine jewelry stores, 1,400 supermarket fuel centers and 38 food production plants in the United States. Kroger is recognized as one of America's most generous companies for its support of more than 100 Feeding America food bank partners, breast cancer research and awareness, the military and their families, and more than 145,000 community organizations including schools. A leader in supplier diversity, Kroger is a proud member of the *Billion Dollar Roundtable*.

Logo - http://photos.prnewswire.com/prnh/20150408/197347LOGO

SOURCE The Kroger Co.

Related Links

http://www.kroger.com

# EXHIBIT 4

Goodman Incentive Compensation

| Year | Incentive Comp(DR1) |
|------|---------------------|
| 2019 | 41832.18 |
| 2018 | 96262.76 |
| 2017 | 0 |
| 2016 | 158873.07 |
| 2015 | 87000 |



EXHIBIT

86

tabbies

CONFIDENTIAL

KSP-00038344

# EXHIBIT 5

```
N8E28F  19125001                          KROGER SPECIALTY PHARMACY
                         PAGE      1
                                          A/R HISTORY FILE LISTING
                        06/26/20


CUSTOMER              DATE       RX #    QUANTITY    DESCRIPTION        AGED DATE
CHARGE ACCT           TYPE       AMOUNT
--------------------------------------------------------------------------------
------------------------------------------
LIM, EMMANUEL         12/01/11             1        CRSTY ADJ BG       01/03/12
LIM, EMMANUEL         CREDIT         51.80
LIM, EMMANUEL         12/14/11  96869448  30                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96886628  20                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881595  45                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881596  100                          01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881598  200                          01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881597  100                          01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  94450567  30                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881600  100                          01/03/12
LIM, EMMANUEL         (POS)         29.95
LIM, EMMANUEL         12/14/11  94450566  30                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881586  9                            01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96864891  200                          01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881601  56                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881589  28                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881591  28                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881592  28                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881590  112                          01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881599  28                           01/03/12
LIM, EMMANUEL         (POS)         16.95
LIM, EMMANUEL         12/14/11  96885491  28                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96881602  28                           01/03/12
LIM, EMMANUEL         (POS)          1.95
LIM, EMMANUEL         12/14/11  96881593  28                           01/03/12
LIM, EMMANUEL         (POS)           .00
LIM, EMMANUEL         12/14/11  96885493  28                           01/03/12
```

EXHIBIT
18
Goodman
12/16/22

CONFIDENTIAL

KSP-00001398

# EXHIBIT 6

**Table 5. Summary of Account Statement Credits and Subsequent AR History Credits.**

| Customer | Statement Date | Cumulative Statement Credits | Subsequent AR Credits | Total Credits |
|---|---|---|---|---|
| ANTON, PETER | 03/02/2015 | $4,517 | $540 | $5,057 |
| COKELY, DAVID | 04/02/2013 | $125 | $- | $125 |
| FLOWERS, KERRY | 07/14/2017 | $1,359 | $30 | $1,389 |
| GOTTLIEB, MICHAEL | 03/30/2018 | $16,039 | $- | $16,039 |
| GRALORE, ERRON | 02/01/2016 | $7,676 | $- | $7,676 |
| LIM, EMMANUEL | 04/27/2018 | $56,450 | $2,406 | $58,856 |
| LYNCH, ERIC | 04/27/2018 | $22,162 | $- | $22,162 |
| MCDONOUGH, DAVID | 01/31/2014 | $6,389 | $757 | $7,146 |
| MUSIKANTH, PHILLIP | 01/03/2017 | $1,915 | $7 | $1,921 |
| ORAVEC, RICHARD | 08/01/2014 | $5,202 | $134 | $5,336 |
| Totals | | $121,834 | $3,873 | $125,707 |

# EXHIBIT 7



CONFIDENTIAL

Relator000003

NRx - KROGER SPECIALTY PHARMACY (Store 3)

File   Edit   New   Reports   Inventory   A/R   Facility Management   Store Control   System Utilities   Help

Leg Out   Rx Tasks   New   Save   Deactivate   More   New Rx   Profile

Patient Record

- General
- Additional Info
- Allergies
- Medical Conditions
- Patient Chart
- HIPAA Signature
- Messages
- Insurance Information
- POS

**FLOWERS, KERRY  FLOWK**

**Patient Information**                                    Status: Normal

Last Name: FLOWERS          First Name: KERRY          MI:

In Care Of: (E-WO)5/O          Title:          Full Name:

te Address:  Create

90045-

Male          ▶          1,104.09

PR

**Patient Notes**

| Stat | Filing Status | Notes |
|------|---------------|-------|
|      |               | DR. MUSKANITH'S S/O DELIVERY FIRST |
|      |               | CHECK ADRESS FOR |
|      |               | PUT ON AR UNLESS MEDS FOR DOGS! |
|      |               | ALL OTHER MEDS ON AR |
|      |               | EG |

Facili

F

Loc

**A/R**

Charge Account: FLOWERS, KERRY          Frozen: ☐          Last Paid: 00/00/00

Auto Post: Do Not Automatically Charge Prescription ▼

Account Limit: 250.00

Previous Balance::          15.00
Charges::          .00
Payments::          .00
Current Balance:          15.00

CONFIDENTIAL

System Date: 07/20/2017          **Relator000063**

All tasks running   |   EDWIN TECHNICIAN

EXHIBIT





NRx - KROGER SPECIALTY PHARMACY (Store3)

File   Edit   New   Reports   Inventory   A/R   Facility Management   Store Control   System Utilities   Help

Log Out   Rx Tasks   New   Save   Deactivate   More   New Rx   Profile

Patient Record

LYNCH, ERIC   LYNCE

**Patient Information**

Status: Normal

Last Name: LYNCH          First Name: ERIC          MI:

In Care Of:   (E-W/O)*****SAFETY CAPS*****          Title:          Full Name:

General
Additional Info
Allergies
Medical Conditions
HIPAA Signature
Messages
Insurance Information
POS

**Patient Notes**

| Stat | Filing Status | Notes |
|---|---|---|
| | | WORK 8920 WILSHIRE BLVD #310; DON'T CALL; JUST SEND MONTHS; TO DR. HONZE'S OFFICE; HE WRKS THER |
| | | *****CHILD LOCK ON ALL ***************** REFILLS APPROVED |
| | | CHARGE ACCOUNT LINKED TO WIESINGERS OFFICE CHARGE CHARGE $195 UNTIL FUTHER NOTICE 01/03/07 |
| | | NOT A MONTH; TRIAL RUN1 12/18/7 |
| | | 6/17/11JU THE REIMBURSMNT ON _____ IS $80 UNDER OUR COST; PER INS IT1 TAKE 14 BUS DAYS TO REVIE |

9/20/13-FRA

1/13/2011

te Address:   Create

90034-

Male

36,5¢4.37

NZELS

**A/R**

Charge Account: LYNCH, ERIC

Auto Post: Do Not Automatically Charge Prescriptor

Account Limit: 250.00

Facili

Loc

Frozen:

Last Paid: 00/00/00

| | |
|---|---|
| Previous Balance: | 98.64 |
| Charges: | .00 |
| Payments: | .00 |
| Current Balance: | 98.64 |

CONFIDENTIAL          System Date: 01/27/2017          Relator0000071

# EXHIBIT 8

**From:** Harnden, Beverly
**Sent:** Wednesday, October 25, 2017 6:42 PM
**To:** Goodman, Brenda
**Cc:** Shore, Jeffrey
**Subject:** FW: ADRX Patient Group

**Follow Up Flag:** Flag for follow up
**Flag Status:** Flagged

Beverly Harnden
Sr. Director, Reimbursement
Office: 714-657-1376 Cell: 949-812-1005

**From:** Sanchez, Brandie
**Sent:** Wednesday, October 25, 2017 11:39 AM
**To:** Harnden, Beverly <Beverly.Harnden@modernhealthinc.com>
**Subject:** RE: ADRX Patient Group

| NRx | Last Name | First Name | October | November | December | January | February | March | P... |
|-----|-----------|-----------|---------|----------|----------|---------|----------|-------|------|
| ANTON, PETER | Anton | Peter | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| FLOWERS, KERRY | FLowers | Kerry | $0.00 | $16.28 | $0.00 | $0.00 | $0.00 | $27.46 | |
| GOTTLIEB, MICHAEL | Gottlieb | Michael | $15.51 | $11.90 | $11.10 | $14.47 | $40.52 | $10.87 | $ |
| GRALORE, ERRON | Gralore | Erron | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 | |
| LIM, EMMANUEL | Lim | Emmanuel | $480.07 | $35.63 | $230.63 | $729.96 | $569.65 | $720.10 | $! |
| LYNCH, ERIC | Lynch | Eric | $16.44 | $16.44 | $16.44 | $96.44 | $126.44 | $0.00 | |
| MCDONOUGH, DAVID | McDonough | David | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| MUSIKANTH, PHILLIP | Musikanth | Phillip | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |

Thank you,

Brandie Sanchez
Patient Services Collection Specialist
Kroger Specialty Pharmacy
Toll Free: 800-228-3643 option 2, 6
Internal extention 1075346
Fax: 866-539-1092
Website: www.krogerspecialtypharmacv.com

1

KSP-00002951

# EXHIBIT 9

| | |
|---|---|
| **From:** | Harnden, Beverly |
| **Sent:** | Monday, April 2, 2018 10:53 PM |
| **To:** | Goodman, Brenda |
| **Cc:** | Shore, Jeffrey |
| **Subject:** | FW: KSPCA2 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Brenda, below are the only balances that have accrued for the 2018 year and we've wrapped up all of the 2017 balances. Have you had the chance to discuss the cbalances for payment with the folks below?

Beverly Harnden
Sr. Director, Reimbursement
Office: 714-657-1376 Cell: 949-812-1005

**From:** Sanchez, Brandie
**Sent:** Monday, April 02, 2018 11:46 AM
**To:** Harnden, Beverly <beverly.harnden@krogerhealth.com>
**Subject:** KSPCA2

Hi Beverly,

Below are the totals balances 4 patients.

| Name | ACCOUNT | Prior Balance | Jan-18 | Feb-18 | Mar-18 | Total Account Balance |
|---|---|---|---|---|---|---|
| LIM, EMMANUEL | LIME | 0 | 1,426.19 | 818.04 | 27.31 | 2,271.54 |
| CHANG, EMERY | CHANEMER | 994.39 | 36.28 | 27.15 | 29.22 | 1,087.04 |
| LYNCH, ERIC | LYNCE | 0 | 321.67 | 148.45 | N/A | 470.12 |
| GOTTLIEB, MICHAEL | GOTTM | 0 | 0 | 20 | 0 | 20 |

GRALORE, ERRON does have a balance, however, he has been paying his balance monthly via check.

Thank you,

Brandie Sanchez
Patient Services Collection Specialist
Kroger Specialty Pharmacy
7373 Lincoln Way
Garden Grove, CA. 92841
Toll Free: 800-228-3643 option 2, 6
Internal extension 1075346
Fax: 866-539-1092
Email: Brandie.Sanchez@Krogerhealth.com
Website: www.krogerspecialtypharmacy.com

1



EXHIBIT
85

Confidential

KSP-00003031

# EXHIBIT 10



**Kroger Specialty Pharmacy**
**Organizational Chart: Post-Name Change**



CONFIDENTIAL

KSP-00000054

# EXHIBIT 11

```
 1    Modern Health had at some point in time.  There

 2    are no assets underneath of it.  There were no

 3    licenses associated with it.

 4                    MR. COHEN:  Okay.  Last one.

 5    Don't get upset.

 6                         (Exhibit 94 was marked for

 7                          identification.)

 8                    MR. WALTON:  Oh, thank you.

 9                    MR. COHEN:  I should say last new

10    one.

11    BY MR. COHEN:

12        Q.    Have you had a chance to look at this

13    document?

14        A.    Yes.

15        Q.    Do you need any more time?

16        A.    No.

17        Q.    Okay.  So this is a document produced

18    by KSP Bates stamped 00054, and it is entitled

19    "Organizational Chart:  Post-Name Change."  Do

20    you see that?

21        A.    I do see that.

22        Q.    And I think I've discussed every

23    pharmacy on this page and you've confirmed that

24    as chief operating officer, you played some

25    leadership role, not alone, with respect to all
```

```
 1    of these pharmacies, correct?

 2                  MR. WALTON:   Objection as to

 3    leadership on all of the pharmacies.  Go ahead.

 4         A.   Yeah, I -- a leadership -- a span of

 5    control over.

 6    BY MR. COHEN:

 7         Q.   Over all of the pharmacies named on

 8    this page?

 9         A.   That is correct.

10         Q.   Okay.  And the span of control --

11         A.   I'm sorry, I take that back.

12         Q.   Okay.

13         A.   I don't know the structure of what

14    sits underneath of The Kroger Company at the

15    very top.

16         Q.   Okay.

17         A.   If that has pharmacies embedded

18    inside of that, which I have no ability to know,

19    that's not anything that I had any

20    responsibility for.

21         Q.   And I'm not asking you to imagine

22    there's other entities that are not on this

23    page.

24         A.   Well, that entity, it is on that

25    page, and I don't know what -- what sits
```

1    underneath of that.

2        Q.    Well, you mentioned in the deposition

3    that there were -- Kroger had its own

4    pharmacies, like pharmacies at Kroger

5    supermarkets, and you did not play a role with

6    those?

7        A.    Not at all, and I don't know what the

8    structure at Kroger is.

9        Q.    Okay.  Okay.  But all of the other

10    pharmacies on this page, you had some span of

11    control in connection with your job as chief

12    operating officer, correct?

13                  MR. WALTON:  Objection.  Go

14    ahead.

15        A.    Yes.

16    BY MR. COHEN:

17        Q.    Okay.  Now, we appreciate that you

18    obtained two W-2s.  I'm not going to mark them

19    as exhibits.  I'm going to maintain them as

20    confidential, but I just want to discuss with

21    you real quickly, the 2016 W-2 identifies your

22    employer as Modern HC Pharmacy, Inc.?

23        A.    Yeah.

24        Q.    And the 2017 identifies -- identifies

25    your employer -- employer's name is addressed as

# EXHIBIT 12



**Joan Schuckenbrock**
*Chief Administrative Officer*

550 Technology Park
Lake Mary, FL 32746

joan.schuckenbrock@modernhealthinc.com
cell 407.604.0957  phone 407.708.5348  toll free 888.315.3270

krogerspecialtypharmacy.com

SPECIALTY PHARMACY



**Lori Galvan, MBA**
*Regional Director, Human Resources*

7441 Lincoln Way
Garden Grove, CA 92841

lori.galvan@modernhealthinc.com
phone 714.657.1407  cell 909.262.7926  toll free fax 855.500.0259

krogerspecialtypharmacy.com

SPECIALTY PHARMACY



# EXHIBIT 13

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Management



**Dom Meiffe**
CEO

**Tom Dervin**
COO
Pages 2-22

**Frannie McGowan**
SVP, Business
Development & Strategy
Page 23

**Joan Schuckenbrock**
CAO
Page 24

**Wayne Nash**
SVP, Trade
Page 25

**Steve Roberts**
SVP, Sales & Marketing
Pages 26-31

**Bill Bucher**
CFO
Pages 32-37

**Jeff Shore**
CIO
Page 38

**Dr. Paul Desrosiers**
Medical Director

Full Time

Temp-to-Hire
Team Member

Durational
Temp

## KEY

**COC** Community Outreach Coordinator
**DMN** Disease State Management Nurse
**MS** Multiple Sclerosis
**ONC** Oncology
**PAC** Patient Access Coordinator
**PAH** Pulmonary Hypertension
**PCC** Patient Care Coordinator
**PIC** Pharmacist in Charge
**SAR** Specialty at Retail
**TL** Team Lead
**TQ** Testing, Quality & Data Analyst

1 Pending Integration Schedule

2 Operations continue to utilize current
SOP's and work guidance. Transition
occurs based on integration schedule.

3 Interim will report directly to Tom
Dervin

**Relator000449**

**CONFIDENTIAL**

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

FOR INTERNAL USE ONLY

Operations



Rosemary McDermott
SVP, Clinical
Development pg. 3

Sal Scaccia
SVP, West
Operations pg. 4

TLCRx
New Orleans, LA
Pgs. 5-7

PX
Garden Grove, CA
Pg. 8

AD-RX
Los Angeles, CA
Pg. 9

Betty Streicher
VP, East
Operations pg. 10

Axium
Lake Mary, FL
Pgs. 13-16

Axium
Guaynabo, PR
Pg. 12

Axium
Ocoee, TN
Pg. 13

Axium
Irvine, CA
Pg. 11

Axium
Vicksburg, MS
Pg. 13

TLCRx 2
Orlando, FL
Pg. 17

Tom Dervin
COO

OPEN
VP, Specialty
Infusion pg. 18

Biofusion
Torrance, CA
Pgs. 19-20

Infusion Services
Dothan, AL
Pg. 21

Infusion Therapy of Texas
Richardson, TX
Pg. 22

Bruce Mole
Dir., Material
Management Pg. 3

Bruce Immel
Dir., Facilities
Management

Andrew Edwards
Mgr., Business
Analyst Pg. 3

CONFIDENTIAL

Relator000450

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Business Analyst
Clinical Development
Material Management



CONFIDENTIAL

Relativity00451

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

West Operations



**CONFIDENTIAL**

Relator000452

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

TLCRx
New Orleans
1 of 3



**CONFIDENTIAL**

Relativity0453

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.
TLCRx
New Orleans
2 of 3

**Sal Scaccia**
SVP, West Operations

**Mark Landry**
VP, Pharmacy Operations

---

**Jonathan Dolese**
Mgr., Pharmacy

- Whitney Ponsell, Pharmacist
- Christy Arnold, Pharmacist
- Janice Wolff, Pharmacist
- Jamie Testa, Pharmacist
- Jeff Haro, Pharmacist
- Nicole Ruiz, Pharmacist
- Zamira DeCld Tech/PAC
- Cassandra Garcia, PAC
- Alyssa DarDar, PAC
- Tachia Franklin, PAC
- Techia Walker, PAC
- Meghan Dauzat, Pharmacist
- Cindy Tong, Pharmacist
- Michael Bordes, Pharmacist
- Meghan Dauzat, Pharmacist, TBD
- Myles Barker, Pharmacist

---

**Amy Theriot**
Dir., Patient Advocacy

- Cinthia Chacon, Patient Advocate
- Bess Alibritten, Patient Advocate Counselor
- Megan Alleman, Patient Advocate
- Melissa Pilotte, Social Worker
- Karen Murphy, Social Worker
- Cinthia Youssef, Patient Advocate
- Nicole Thomas, Patient Advocate
- OPEN, Patient Advocate
- Yeimy Sanchez, Patient Advocate

---

**Mary Guillot**
Mgr. Pharmacy

**Meagan Piazza**
Pharmacist

**Mallory Bergeron**
Supervisor, Patient Services

- Kirsten Ruiz, PSC
- Sarah Willis, PSC
- Deborah Williams, PSC
- Meredith Haro, PSC
- Jennifer Wichers, PSC
- Courtnei Franco, PSC

**Kristen Allen**
Supervisor, Patient Services

- Jody Garcia, PSC
- Dita Kabashi, PSC
- Meredith Wiles, PSC
- Rhonda Jordan, PSC
- Ayah Walker, PSC
- Shenehtia Hutton, PSC

**Katelyn Miller**
Supervisor, Patient Access

- Teaonde Harrison, PAC
- Emily Duvernay, PAC
- Erica DeLatte, PAC
- Liz Tucker, PAC
- Rebecca Leonard, PAC
- Wil Ramey, PAC
- Kelly Romo, PAC
- Kristine Hoang, PAC

Relativity_000454

---

**Kristin Norton**
Dir., Clinical Services

- Jenifer Andry, Nurse, Clinical Specialist
- Eileen Culotta, Nurse, Clinical Specialist
- Alexis Wiles, Clinical Pharmacist Liaison
- JC Andry, Clinical Pharmacist Liaison
- Candace Zerin, Clinical Pharmacist Liaison

---

**Nicole Ditta**
Mgr. Pharmacy

- Bridgette Foret, Nurse, Clinical Specialist
- Dee Ann Bazile, Pharmacist
- Danielle Smith, Pharm Tech

**Alyssa Kieff**
Supervisor, Patient Access

- Latoya Conley, PAC
- Jasmine Godfrey, PAC
- Christine Nguyen, PAC
- Crystal Hill, PAC (CV)
- Judy Debose, PAC
- Summer Belero, PAC
- April Anderson, PAC
- OPEN, PAC (Critical Care/CV)

CONFIDENTIAL

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.
TLCRx
New Orleans
3 of 3



Relator 000455

**CONFIDENTIAL**

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.
PX
Garden Grove

FOR INTERNAL USE ONLY



CONFIDENTIAL

Relator_000456

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

AD-RX
Los Angeles



Relat_0000457

**CONFIDENTIAL**

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

FOR INTERNAL USE ONLY

East Operations



CONFIDENTIAL

Relativity000458

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.
Axium
Irvine



**Relator000459**

**CONFIDENTIAL**

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Axium
Puerto Rico

Betty Streicher
VP, East
Operations

Esther Bosques-
Caro
Dir., Pharmacy

Maralis Cruz
PCC Supervisor

Mililyza Baez
Lead NPCC

Synthia Rodriguez
NPCC

Lilianna Coporan
NPCC

Mirna Agosto
PCC

Kritzia Santos
PCC

Joanelys Rojas
PCC

Naomy Nieves
PCC

Moraima Davila
PCC

Daphne Rivero
PCC

Deborah Delgado
PCC

Patricio Berrios
PCC

Luarent Castillo
PCC

Izamari Marrero
PCC

Carlos Marquez
PCC

Jonuel Berrios-Ortiz
PCC

Luis Diaz
PCC

Wanda Llordat
PCC

William Flores
Velez
PCC

Wanda Llordat
Receptionist

Leila Velez
Clinical Intervention
Pharmacist

Letty Izquierdo
Pharmacy Support

Addymarie Basco
Pharmacy Support

Yelixza Lopez
Pharmacy Support

Yaraliz Rodriguez
Clinical Prgrn & Dev
Pharmacist

Bernardo
Maldonado
Reg Nurse Case Mgr

Carmen Arroyo
PAH Nurse

Gricel Terron
Clinical Nurse

Angelica Castro
Clinical Nurse

Sonia Rodriguez
Clinical Nurse

Daniel Torres
Pharm Tech

Christian Montanez
Pharm Tech

Bryan Rullan
Pharm Tech

Mirrales Rodriguez
Pharm Tech

Edmar Pierluissi
Pharm Tech

Zoe Nieves
Pharm Compliance
Coordinator

William Ortiz
Shipping/Tracking

Ramos Vallejos
Shipping/Tracking

Marielys Santos
Staff Pharmacist

Yamil Nieves-Otero
Pharm Tech Sup

Lariz Diaz
Pharm Tech

Maria Mateo
Pharm Tech

Jahnnilys Lopez
Pharm Tech

Nefer Gonzalez
Pharm Tech

Krystal Berrios
Asst PIC

Nahria Gonzalez
Purchasing

Normaliz Melendez
Staff Pharmacist

Maribel Resto
Staff Pharmacist

Ramon Clemente
Pharm Tech

Lorraine Hernandez
Pharm Tech

Jessica Melendez
Pharm Tech

Jerixa Sanchez
Pharm Tech

Zaida Catala-
Pereira
Operations Specialist

Ivelisse Vazquez
Pharm Tech Lead

Glenda Altrechi
Pharm Tech

Victor Cruz
Pharm Tech

Orimaris Berrios
Pharm Tech

**CONFIDENTIAL**

Rela426500460

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Axium
Lake Mary
1 of 4

**Betty Streicher**
VP, East Operations

**Kevin Wiltz**
Dir., Pharmacy LM

**Amanda DeGraeve**
Pharmacy Tech Mgr

**Axium Tennessee**

**Sharon Green**
Lead Pharm Technician

**Starling Hunter**
Pharm Tech I

**Daniel Sinclair**
Pharm Tech II – MS

**Frances Perez**
Pharm Tech II – MS

**Sherita Jones**
Ins. Verifier I – MS

**Samantha Hutchinson**
Pharm Tech I – MS

**Marsha Harris**
Ins. Verifier I – MS

**Evelyn Stolard**
NPCC II – MS

**Tamesha Moore**
PCC I - MS

**Shakira Holley**
NPCC I - MS

**Harryl Burley**
PCC I - MS

**Dalissa Carroll**
PCC I - MS

**OPEN**
Pharm Tech I

**Lillian Rodriguez**
Pharm Tech I - ONC

**Christi Bolton**
Pharm Tech I - ONC

**Danna Finley**
Pharm Tech I - ONC

**Nataly Infinger**
Pharm Tech I – Hep C

**Leinadee Rivera**
Pharm Tech I – Hep C

**Paola Raposo**
PCC II

**OPEN**
Pharm Tech I

**Wanda Garcia**
PCC II - Celgene

**Abraham Rodriguez**
PCC II - Celgene

**Samara Vazquez**
Pharm Tech I - Celgene

**Noemi Arce**
Pharm Tech III - Celgene

**Anitra Frederick**
Pharm Tech I – Hep C

**OPEN**
Pharm Tech I

**OPEN**
Pharm Tech I

**Matthew Dixon**
Axium Mississippi

**Luis Cortes**
Pharm Tech Sup

**Arsany Girgis**
Pharm Tech I

**Chelsea Reeves**
Pharm Tech I

**Rebecca Crunk**
Pharm Tech I

**Chrisbel Malewski**
Pharm Tech I

**Eloy Rangel**
Pharm Tech II

**Shaneatris Walls**
Pharm Tech I

**Veronica Basjit**
Pharmacy Flow Mgr

**Shavesh Sarran**
Shipping & Facilities Clerk

**Nicholas Fisher**
Shipping

**Frank Ramos**
Pharm Tech I

**Marilyn Ocasio-Haddock**
Pharm Tech I

**OPEN**
Pharm Tech Order Check

**Ramesh Kissoon**
Pharmacy Tech Lead

**James Anderson**
Shipping & Facilities Clerk

**Jennifer McCaskill**
Pharm Tech II

**Philip Thetford**
Pharm Tech II

**Michael Mason**
Staff Pharmacist

**Heli Patel**
Staff Pharmacist

**Pauline Broderick**
Staff Pharmacist

**Keith Rentz**
Staff Pharmacist

**Michelle Hernandez**
Staff Pharmacist

**Mohamed Dungarisi**
Staff Pharmacist

**Siddharth Patel**
Staff Pharmacist

Axium_000461

CONFIDENTIAL

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Axium
Lake Mary
2 of 4



CONFIDENTIAL

Relate60000462

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Axium
Lake Mary
3 of 4



CONFIDENTIAL

Relator000463

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Axium
Lake Mary
4 of 4

**Betty Streicher**
VP, East Operations

**Johnny Brasell**
Call Service Mgr.

**Jennifer Sevon**
Pharm Training & Comm. Asst. Mgr.

**Carmen Torres**
Pharm Training & Comm. Coord.

**Sharon Kelsick**
Operations Trainer

**Nadonie Beaussejour**
Operations Trainer

**London Davis**
Ops Support Specialist

**Alex Figueroa**
Operations Support Intern

**Hazel Phillips**
HUB Operations Mgr.

**Corrinne Artis**
PCC Team Lead

**Ashley Williams**
PCC II

**Crystal Riley**
PCC II

**Leah Tofte**
PCC I

**Dawn Johnson**
PCC I

**Janai Jackson**
PCC I

**OPEN**
PCC I

**Jannette Minutolo**
PCC Team Lead

**Jaymini Chandarana**
PCC III

**Vanessa Harris**
PCC I

**Damaris Flores-Vega**
PCC I

**Paige Dewhirst**
PCC I

**Chelcia Ivory**
PCC I

**Kristine Moore**
PCC I

**Donald Washer**
Patient Assistance Program Mgr.

**Natasha Toussaint**
PCC II

**Jamal Jackson**
PCC II

**Dezarae Langhorn**
PCC I

**Jennifer Schemenauer**
PCC I

**Christian Davila-Cepeda**
PCC I

**Chenee O'Connor**
PCC I

**Sarah Sweet**
Patient Care Team Lead - SAR

**Angela Acevedo**
PCC I - SAR

**Nekeisha Singleton**
PCC I - SAR Convert 9/26

**Ericka Dunlap**
PCC I - SAR

**Nicole Blanca**
PCC I - SAR

**Jennifer Baptise**
PCC I - SAR

**OPEN**
PCC I - SAR

**Tiwanna Charles**
PCC I

**Samira Vaziri**
PCC I

**Melanie Mejia**
PCC I

**Yvelouse Leow**
PCC I

**Jennifer Greer**
PCC I

CONFIDENTIAL

Relator000464

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

TLCRx
Orlando



Relate000465

**CONFIDENTIAL**

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Specialty Infusion



Tom Dervin
COO

OPEN
VP, Specialty
Infusion

Infusion Services
Dothan, AL
Pg. 21 [3]

Biofusion
Torrance, CA
Pgs. 19-20 [3]

Infusion Therapy of
Texas
Richardson, TX pg.
22 [3]

Chris Welsh
VP, GM

Mary Kay Welsh
VP, Pharmacy
Operations

James Markis
VP, Pharmacy
Operations

Justin Graves
VP, GM

CONFIDENTIAL

Relator000466



Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.
BioInfusion
Torrance
1 of 2

CONFIDENTIAL

Relativity000467

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Biofusion
Torrance
2 of 2



**CONFIDENTIAL**

Relator000468



Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.
Infusion Services
Dothan

**CONFIDENTIAL**

Relator000469

OPEN
VP, Specialty
Infusion

Mary Kay Welsh RPh
VP, Pharmacy
Operations

Tiffani Murphy
Pharmacist

Laura Brown
Pharmacist

Nikita Boling
Lead Pharmacy
Tech

Jennifer Garner
Pharmacy Tech
PRN

Ashleigh McCall
Pharmacy Tech,
PRN

Jennifer Deese
PCC

Margarita Dallas
Pharmacy Tech

Amanda Riddle
Administrative
Specialist

Bernadette Bishop
Billing Specialist

Kathy Pierce
Receptionist

Beverly Cockrell
Admin Assistant

Teara Allard
PAC

Debra Cochran
Billing Specialist

Angelique
Solomon
Billing Specialist

Donna Struble
Billing Specialist

Kasey Money
Billing Specialist

Chris Welsh
VP, GM

Elaine Haney,
Mgr, Area Nurse

Tiffany Ivey, RN
Nurse
Per Diem

Kathleen Howell
Nurse, Staff

Joni Simmons,
BSN
Nurse, Staff

Tammy Danford
Nurse, Staff

Steve Whitehead
Driver

Chris Hamm
Driver

Truett Haire
Driver (PT)

Jessica Kamke
RN – Infusion
Specialist

Shelley Scarborough
RN – Infusion
Specialist

Barbara Miller
Nurse, Per Diem

OPEN
RN – Infusion
Specialist

Sandra Holmes
RN – Infusion
Specialist

Philip Atkinson,
Mgr, Compliance

Dan Henderson
Delivery Driver
(PT)

OPEN
Delivery Driver
(PT)

OPEN
Delivery Driver
(PT)

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.
Infusion Therapy of Texas
Richardson



**CONFIDENTIAL**

Relator000470

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Business Development
& Strategy



CONFIDENTIAL

Relator000471

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

## HR, Compliance & Administration

FOR INTERNAL USE ONLY

**Joan Schuckenbrock**
CAO

---

**Tina Winter**
Mgr., Org. Dev.

- Victoria Strong — Admin Team Lead
- Victoria Andino — Administrative Asst.
- Rebecca Troche — Admin Assistant

---

**Niccole Cipriani**
Executive Assistant

- Ann Marie Cotto — Office Administrator

---

**OPEN**
Sr. Dir., Compliance

- Stephanie Sebastian — Sr. Compliance Specialist
- Tia Addison-Pinellas — Sr. Compliance Specialist
- Helen Meredith [1] — Compliance Coord.
- Reginald Ryles [1] — Compliance Administrator

---

**Suzanne Balius**
Dir., Payroll & Benefits

- Rita Vicencio — Payroll & Benefits Coordinator

---

**Heather Burks**
VP, HR

### Central HR Services

- Ryan Partridge — HR Recruiter
- Saskia Bryant — Jr. Recruiter
- Amy Fahlstrom — Sr. HR Generalist
- Marcus Williams — Sr. HR Generalist
- Alanna Buono — Sr. HR Generalist
- Nellie Menendez — HR Coordinator

### Regional HR Services

- **Sonia Griffin** — Regional Dir., HR — LM, PR, MS, TN, IR ORL [1]
- Katreece Dunbar — HR Generalist
- **Lori Galvan** — Regional Dir., HR — GG, ADRX, BF
- Edie Laguna — Sr. HR Generalist
- **Jamie Burmaster** — Regional Dir., HR — NOLA, Addison, ITOT [1], IS [1]
- Julie Chastant — Mgr., Site Support
  - Ellen Herry — Administrative Assistant
  - Toni Barlotta — Administrative Assistant

---

**Relator000472**

**CONFIDENTIAL**

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Trade



Relator000473

**CONFIDENTIAL**

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

FOR INTERNAL USE ONLY

Sales & Marketing



**CONFIDENTIAL**

Relator 000474

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

FOR INTERNAL USE ONLY

Sales: Specialty Infusion



CONFIDENTIAL

Relativity000475

Axium Pharmacy Holdings, Inc.

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Sales: Oncology & Cardiology



Rela2t7e9d80000476

CONFIDENTIAL

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Sales: HIV & Transplant
Payor Contracting

Steve Roberts
SVP, Sales & Marketing

John Mills
Director, Payor
Contracting

Kris Nicklaus
Account Mgr – Managed
Care (RMHP)

Michael Ward
Managed Care
Business Dev. Dir.

Kendra Merrell
Dir. Of Managed
Care Sales

Brenda Goodman
SVP, HIV/TP Business
Development & Sales

Theresa Murray
Director,
Transplant Svcs

Jeannine DeMoe
Patient Advocate

Tracey Cumberland
Director,
HIV Services

Jose Martinez
Madrigal
COC

Milton Nassar
Specialty
Account Manager

Juan Rivera
Patient
Advocate

Jose (Javier)
Hernandez
COC

Andre Quintana
COC

Arin McNeese
Specialty Account
Manager

Tammy Lam
Sales Marketing
Specialist

**CONFIDENTIAL**

Relator_000477

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

## Sales: Autoimmune & Hepatolgy

**Steve Roberts** — SVP, Sales & Marketing

**Chad Latimer** — VP, Sales Autoimmune/Hepatology

- **Claudia Glass** — Sales Trainer

- **Colleen Slugard** — Dir., Sales Autoimmune/Hepatology
  - **Brooks Madison** — Specialty Acct. Mgr — TN
    - **Ken Carpenter** — Specialty Acct. Mgr — FL
  - **Owen Newman** — Specialty Acct. Mgr — MS
    - **Chris Anderson** — Specialty Acct. Mgr — FL
  - **Ashley Voorhies** — Specialty Acct. Mgr — IN
    - **Yamila Velasco** — Specialty Acct. Mgr — FL
  - **Scott McGonigal** — Specialty Acct. Mgr — Northern IL/WI
    - **Kevin Miles** — Specialty Acct. Mgr — FL
  - **Matthew Venditilli** — Specialty Acct. Mgr — MI/Northern OH
    - **Lamonde Russell** — Specialty Acct. Mgr — AL/GA
  - **Natalie Palmer** — Specialty Acct. Mgr — VA
    - **ST White** — Specialty Acct. Mgr — NC/SC

- **Nicole Tovar** — Dir., Inside Sales Autoimmune/Hepatology
  - **Karen Rivera** — Specialty Acct Rep — Orlando
  - **Jorge Franco** — Specialty Acct Rep — NOLA
  - **Nicole Batarse** — Specialty Acct Rep — Orlando
  - **Karla Leveque** — Specialty Acct Rep — NOLA
  - **OPEN** — Specialty Acct Rep — NOLA
  - **Jacqueline Moody** — Specialty Acct Rep — NOLA
  - **Stacy Gautreau** — Specialty Acct Rep — NOLA

- **OPEN** — Dir., Sales Autoimmune/ Hepatology
  - **Steve Gjenero** — Specialty Acct. Mgr — LA
    - **Princess Easter** — Specialty Acct. Mgr — OK/Southern KS
  - **Susan Abrego** — Specialty Acct. Mgr — TX
    - **Bright Ogbogu** — Specialty Acct. Mgr — TX
  - **Carlos Flowers** — Specialty Acct. Mgr — TX
    - **OPEN** — Specialty Acct. Mgr — CA
  - **Gina Rogers** — Specialty Acct. Mgr — TX
    - **OPEN** — Specialty Acct. Mgr — CO/WY/MT
  - **Eric Quint** — Specialty Acct. Mgr — MO/Southern IL/ Eastern KS
    - **Keith Barron** — Specialty Acct. Mgr — AZ/NM
  - **Jennifer Purdon** — Specialty Acct. Mgr — AZ

CONFIDENTIAL

Relator500478

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

Strategic Markets

FOR INTERNAL USE ONLY



**CONFIDENTIAL**

Rela405000479

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

FOR INTERNAL USE ONLY

Finance



Bill Bucher
CFO

Andrew Broadrup
Dir., Financial
Planning & Analysis
Pg. 33

Debra Cole
Regional Corporate
Controller
Pg. 34

Vince Cook
CFO
ModernHEALTH
Pg. 35

Brenda Fiorito
Dir., RCM
LM
Pg. 36

Beverly Harnden
Sr. Dir., RCM
GG
Pg. 37

**KEY**
AD – Addison, TX
DO – Dothan, AL
GG – Garden Grove, CA
IR – Irvine, CA
LA – Los Angeles, CA
LM – Lake Mary, FL
NO – New Orleans, LA
OR – Orlando, FL
PR – Puerto Rico
RH – Richardson, TX
TR – Torrance, CA

**CONFIDENTIAL**

**Relativity00480**

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Financial Planning & Analysis
Lake Mary



Bill Bucher
CFO

Andrew Broadrup
Dir., Financial
Planning & Analysis

Michael Henschke
Financial Analyst

Shaikh Sultani
Mgr, FP&A

Relativity0000481

CONFIDENTIAL

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Accounting
Lake Mary



Bill Bucher
CFO

Debra Cole
Corporate
Controller

Sara Long
Payroll Accountant
(PT)

Sarah Rockwood
Payroll Accountant

Mari Rico
Accounting Sup.

Jason Latta
Sr. Staff Accountant

Silvia Roeglin
A/P Coordinator

Dustin Norris
Staff Accountant

Relator 000482

**CONFIDENTIAL**

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

Finance
Garden Grove

FOR INTERNAL USE ONLY



**Bill Bucher** — CFO

**Vince Cook** — CFO, ModernHEALTH

**Brett Dethmers** — Dir, FP&A
- **Paul Yung** — Sr. Financial Analyst

**Kathy Brown** — Executive Assistant

**Scott Barton** — Corp. Controller ModernHEALTH

**Lan Vu** — Mgr, Accounting (NOLA)
- **Linh Lam** — Sr. Accountant TLCRK LA

**JF Gignac** — Lead Senior Accountant

**Heather Dang** — Sr. Accountant

**Sharon Horras** — Interim Manager, Special Projects

**Kallie Li** — Mgr, Accounting
- **April Chiu** — Sr. Accountant
- **Tom Tran** — Sr. Accountant
- **Nayomi DeSilva** — Sr. Accountant
- **Vimala Yellapu** — Sr. Accountant

**Lisa De Blasi** — Mgr, Accounts Payable
- **Kaitlin Bui** — Lead Sr. AP Specialist
- **Marcie Gonzalez** — Sr. AP Specialist
- **Jenny Tran** — Sr. AP Specialist
- **Christina Sy** — Sr. AP Specialist

Relativity 000483

**CONFIDENTIAL**

Revision: 9.16.2016

Axium Pharmacy Holdings, Inc.

## Revenue Cycle Management (RCM)
Lake Mary

FOR INTERNAL USE ONLY



Bill Bucher
CFO

Brenda Fiorito
Dir., RCM
LM

Theodore Cahue
Quality Specialist

Mary Colon
Cash/Billing Supervisor

Shannel Navarro
Team Lead

Teresea Philipsen
Cash Apps

Patricia Rivera
Biller

Kathy Sedgwick
Cash Apps

Gail Simpson
Biller

Gladys del Valle
Cash Apps

Cheryl Smith
Poster

Jeanne Roberts
Poster II

Nancy Alvarez
Biller

Joshua Soto
Payor Analyst
PR

Andriette Nieves
Data Entry

Berna Mills
Reimbursement
Mgr

Erick Lugo
Collections Team
Lead

Candida Garcia
Rimb. Specialist

Melvy Torres
Rimb. Specialist

Nery Pabon
Rimb. Specialist

Sharon Liriano
Rimb. Specialist

Wanda Espejo
Rimb. Specialist

Reeshemah
Maddox
Rimb. Specialist

Victoria Diaz
Rimb. Specialist

Maria Figueroa
Rimb. Specialist

Danyell Stafford
Rimb. Specialist

Catherrine
Hernandez
Rimb. Specialist

Dawn Williams
Admin Assistant III

Ricardo Ferrer
Verification Sup.

Bertha Sein
Team Lead

Lori Johnson
Verifier

Damaris Gines
Verifier

Elizabeth Pizarro
Verifier

Ana Colon
Verifier

Lynnette Cruz
Verifier
PR

OPEN
Ins. Verifier I

Daymarie Merced
Verifier

Damaris Reeves
Ins. Verifier

CONFIDENTIAL

Relativity0050484

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

Revenue Cycle Management (RCM)
Garden Grove, Orlando, New Orleans



**CONFIDENTIAL**

Relativity 000485

Revision: 9.16.2016

FOR INTERNAL USE ONLY

Axium Pharmacy Holdings, Inc.

IT

**Dom Meffe**
CEO

**Lisa Byrd**
Service Owner Health & Wellness & Retail Solutions Business

**Jeff Shore**
CIO

**Kathryn Pagani**
Executive Assistant

**Luke Altenburg**
Mgr., Infrastructure & Facilities

- Tyler Klink — Technology Engineer
- Edgar Delres — Technology Engineer
- Paul Jaramillo — IT Ops Analyst
- Michael DeSantis — Ops Analyst
- Travis Hastley — Technology Engineer
- Josue Rodriguez — Help Desk Tech PR
- OPEN — Support Analyst

**Chris Ortega**
Mgr., BI/Development

- Lisa Morales — Developer
- Ernesto Rio — SQL Developer
- Tracy Webb — SQL Developer
- AJ Minhas — Database Administrator

- Elmer Donovan — Developer
- Kyle Nash — Developer
- Franc Aldaz — SQL Developer
- Walter Major — Database Administrator
- Emmanuel Madera — SQL Developer
- Bigut Llamsai — SQL Developer

- Oxana Nishchenko — Applications Analyst
- John Boyer — Developer
- James Boyd — SQL Developer
- Josh Reynolds — DBA
- Jyothona Proddulure — Developer
- Randal Sims — SQL Developer

**Wyn Bryant**
IT Consultant (Orlando)

- Drtian Voahtina — IT Consultant (ITOT)
- Alex Horlynski — Service Desk Support Analyst (Orlando)
- Wiregrass — IT Consultant (Infusion Services)

**Mark Trazi**
Director, IT Infrastructure

- Andrew Stock — Sr. System Engineer
- Arvin Leong — Sr. Citrix Engineer
- John Urquidi — Sr. Network Engineer
- Brian Lane — Sr. Telecom Engineer

**Francois Louw**
Director, Business Intelligence

- James Harrel — Database Administration
- Ruben Dominquez — Business Intelligent Eng.
- Siraj Rizzi — BI Engineer
- Christina Wheeler — SharePoint Consultant (PRN)

- Hogan Le — Mgr., Business Intelligence
- William Neville — BI Engineer
- Bharathi Diddi — BI Engineer
- Amar Sambuu — BI Engineer

**Terry Sohariel**
Director, Bus Appl

- Eugene Wendera — Sr. Applications Support Analyst
- Bryan Stone — Sr. Business System Administrator
- Logan Haynes — Technical Product Manager
- Daniel Lucas — Supervisor, IT Service Desk

- Paul Caicedo — Service Desk Support Analyst (CA)
- Vinh Vu — Sr. Service Desk Support Analyst (CA)
- Brian Lister — Sr. Service Desk Analyst
- James Terrebone — Service Desk Support Analyst 9/26

- Lonnie Griesemer — Business Analyst (Reports to Rudy Zapta)
- Karen Durney — Business Analyst (Reports to Rudy Zapta)
- Terry Krauss — BI (Reports to Brian Baldly)

Relator 0486

CONFIDENTIAL

# EXHIBIT 14

**Edwin Gvalevech**

| | |
|---|---|
| **From:** | Dom Meffe |
| **Sent:** | Friday, September 2, 2016 8:52 AM |
| **To:** | MHCP All Team |
| **Subject:** | Merger status |

I am pleased to confirm that the merger announced by Kroger on July 20th to bring Axium and Modern Health together to form one larger and stronger specialty pharmacy organization has closed successfully.

Since the announcement, our teams have spent a lot of time listening, learning and asking questions – just like we said we would. Knowledgeable and experienced people from many areas within each organization have participated in this initial process and I offer my sincere thanks to everyone who has contributed.

The pre-close window was a short time frame, and there were limitations on the information we could access and share, so I know we have just barely scratched the surface on the work to be done. There is still much to understand – and we will keep learning together. I will continue to need, and ask for, your help and feedback as we move from this stage into the true integration process.

Following the holiday on Monday, we will begin communicating the overall organizational structure for the full team. Naturally, there will be some reporting changes, title updates and/or role adjustments in some areas to get to a solid coverage of responsibilities, territories and management support for our combined team. To take good care of our people, we need to walk through those changes directly with the individuals and/or teams that will see some modifications before we announce it overall. We will take the time to communicate well. As we have said often, we have a lot of work to do and ample opportunity for each of you to contribute to our success.

Today, I am pleased to introduce the senior leadership structure that will be reporting directly to me as CEO and supporting our unified team going forward. I have also called out a couple key executives to ensure you know their status with the organization. We have created a strong combination of talent from our original organizations and I am excited about working with this team – and with each of you – to take our business to the next level.

> **Frannie McGowan - Senior Vice President, Business Development & Strategy** – In this new role, Frannie will be executive sponsor of the extensive and detailed integration process necessary to bring our companies together to form one strong and highly productive organization. She will also coordinate our engagement with Kroger's health and wellness initiative – ensuring that we contribute to and benefit from this significant future growth opportunity. Frannie will also guide merger and acquisition and other new business development activities as warranted to meet our strategic goals.

> **Tom Dervin – Chief Operating Officer** – Tom, as COO, will now support an operations structure that includes nearly 600 associates across our combined pharmacy teams. The areas of clinical development, operational facility management and materials management will also report Tom.

>> **Rosemary McDermott** will continue to report to Tom and support our clinical development, pharma program implementation and quality initiatives and **Sal Scaccia** will also continue to be a operations leader on Tom's team driving excellence and passion through the facilities he touches.

> **Steve Roberts - Senior Vice President, Sales and Marketing** – Sales units from across the country will come together under Steve's leadership in this role – allowing our external and internal sales teams to benefit fully from the integration. Steve will also support the Marketing and Communication team in this role.



**CONFIDENTIAL**                    1
                    **Relator000513**

**Bill Bucher – Chief Financial Officer –** As CFO, Bill will lead the coordination of the finance, accounting and reimbursement teams to ensure ongoing and strong support for our combined multi-billion dollar organization.

**Jeff Shore – Chief Information Officer –** Jeff, as CIO, is charged with ensuring that our business and technology needs are strongly and effectively supported; coordinating across our business unit working closely with the Kroger IT support structure.

**Wayne Nash – Senior Vice President, Trade –** In this role, Wayne and team will be responsible for all areas of trade relations and the development of new business opportunities with our manufacturing and industry partners.

> **Dave DuRoss, VP of Trade** will report to Wayne and continue his role in sales and account management with our pharma partners.

**Joan Schuckenbrock – Chief Administrative Officer –** Joan will continue to lead the teams that provide human resource, regulatory and compliance, and administrative services to our organization.

**Vince Cook,** CFO for ModernHealth, will actively be supporting our transition process during the first severalmonths of the integration and will be available afterwards for any consulting services as needed. He has been an integral part of the growth of ModernHealth since 2012 and a significant contributor to the successful merger process with Kroger. I value his knowledge, professionalism and friendship tremendously – and know we will benefit from his work with Bill and team in building out the financial integration plan.

While not taking an active day-to-day role going forward, **Mark Montgomery,** former CEO for Axium, has graciously offered to be available to support me with the integration of our companies and other business development items through the end of the year. Mark helped build and develop Axium since 2003 and championed the importance of growing the specialty pharmacy organization through the merger. His counsel and expertise are highly valued and I appreciate his ongoing support as we transition.

**Gerry Dabkowsky,** former VP of Sales for Axium will also not be taking a day-to-day role going forward but will be available to support Steve and the team through the end of the year. Gerry had a vital role in the development of Axium – building a significant team of sales professionals. He has been a true professional helping Steve understand theAxium go to market strategies and team.

We will continue to be disciplined and thoughtful in how we design our new organization – without losing critical competitive momentum and our clarity of focus on the patients we serve. As we move forward, you will hear me say often that the most important element indeveloping this successful and dynamic business together is how we treat one another as colleagues each day. In the future, what I hope we remember most is how well we took care of our fellow associates as we tackled challenges, grew the company and celebrated achievement together.

I look forward to building this organization with you. Game on!

Have a safe and wonderful Labor Day weekend,

Dom

**CONFIDENTIAL**                    **Relator000514**